# UPHAUS *v.* WYMAN, ATTORNEY GENERAL OF NEW HAMPSHIRE.

No. 336.   Decided November 14, 1960.

*Louis Lusky, Grenville Clark, Marvin H. Morse, Dudley W. Orr, Royal W. France, Hugh H. Bownes* and *Leonard B. Boudin* for appellant.

*Louis C. Wyman,* Attorney General of New Hampshire, appellee, *pro se.*

PER CURIAM.

In view of the Court's decision in *Uphaus* v. *Wyman,* 360 U. S. 72, rehearing denied, 361 U. S. 856, the motion to dismiss is granted and the appeal herein is dismissed for want of jurisdiction, in that the judgment sought to be reviewed is based on a non-federal ground.

MR. JUSTICE BRENNAN.

The New Hampshire Supreme Court has held in this proceeding that the New Hampshire Legislature still wanted Dr. Uphaus' answers on December 14, 1959, not-

withstanding the omission from Laws 1957, c. 178, of the provision of Laws 1955, cc. 340 and 197, authorizing the Attorney General "to determine whether subversive persons . . . are presently located within this state," *Wyman* v. *Uphaus,* 102 N. H. 461, 159 A. 2d 160; on denial of motion for bail, 102 N. H. 517, 162 A. 2d 611. We are bound by the highest state court's construction of the pertinent New Hampshire statutes. We must therefore consider the substantiality of the federal constitutional questions presented on this appeal on the basis of that construction and not upon the premise urged by Dr. Uphaus that the 1957 statute shows that the legislature on December 14, 1959, no longer wanted him to produce the list of names. In consequence, while I remain of the view that the Court in *Uphaus* v. *Wyman,* 360 U. S. 72, incorrectly sustained the previous order of civil contempt made against Dr. Uphaus, see dissent at page 82, that holding, while it stands, also sustains the order challenged on this appeal. Solely under compulsion of that decision, I think that the appeal must be dismissed as not presenting a substantial federal question.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

I concur in the dissent of MR. JUSTICE DOUGLAS and agree with him that since the New Hampshire law upheld by this Court in *Uphaus* v. *Wyman,* 360 U. S. 72, has now been changed, new federal questions are presented which cannot be dismissed as involving only the correctness of a ruling on local law, and that we consequently should not dismiss this appeal but should note jurisdiction, grant bail and hear arguments. The recent amendment withdrew the power, involved in the previous appeal, which authorized the Attorney General of New Hampshire "to determine whether subversive persons . . . are presently located within" the State, and thus took

away the very power under which the Attorney General was acting when he demanded the names of guests at the summer camp in New Hampshire managed by the appellant, Dr. Willard Uphaus. Notwithstanding that fact, the New Hampshire courts have held that the State still has an interest in those names sufficient to justify the continued imprisonment of Dr. Uphaus for his refusal to comply with the demand to produce them.[1] This appeal therefore raises federal questions as to whether this latter holding violates the Federal Constitution. I think that the Court's action today in treating those federal questions as insubstantial[2] is wrong in at least two different respects.

First, I think this action is inconsistent with the Court's own test as set forth in its opinion on the prior appeal and there used to square the imprisonment of Dr. Uphaus with the First Amendment. That test was stated in these terms: "The interest of the guests at World Fellowship in their associational privacy having been asserted, we have for decision the federal question of whether the public interests overbalance these conflicting private ones."[3] This required the Court to weigh the interest of those guests against the interest of the State, as broadly expressed by its legislature, in knowing

---

[1] As indicated by my concurrence in the opinion of MR. JUSTICE DOUGLAS, I think the better interpretation of that holding is that it rests upon the theory that the imprisonment is for criminal contempt, and I think that MR. JUSTICE DOUGLAS conclusively demonstrates that if that is so, this Court cannot properly refuse review of that imprisonment. But the Court's dismissal of the appeal is an implicit holding that the New Hampshire Supreme Court's action rests upon the civil contempt theory. Even upon that view, however, I think the present appeal raises federal questions both new and substantial.

[2] Implicit, of course, in the Court's order dismissing this appeal because the judgment is based on a nonfederal ground is the holding that the federal questions actually presented are insubstantial.

[3] 360 U. S., at 78.

"whether subversive persons . . . are presently located within" the State, a balancing process[4] which there resulted in the conclusion that the state interest must prevail. Now, however, it is clear that the interest of the State so weighed no longer exists and a new balance must be made if the invasion of "associational privacy" previously sanctioned is to be permitted to continue. But this the Court refuses to do, apparently on the theory that the present appeal is controlled by the previous disposition. It seems to me that "balancing" which refuses to take note of such an important change in the interest of the State is little balancing at all—a mere illusion, in fact.

Secondly, it seems to me that the record as it now stands before this Court requires a reappraisal of the question whether the actions of the State of New Hampshire constitute a bill of attainder in violation of Art. I, § 10, of the Constitution. On the prior appeal, the majority of this Court held that the record *as it then stood* would not justify such a conclusion. The present record, however, presents new facts relevant to that issue. For here we are confronted with a situation in which the courts of New Hampshire have stated that it was the intention of the legislature of that State to permit the Attorney General to single out Dr. Uphaus and any others (if, indeed, there are any others) against whom investigative proceedings had already been commenced and to pursue those proceedings, not in furtherance of any general aim of the State—that general aim, if it ever existed, has been abandoned by the amendment—but apparently for the sole purpose of setting these people off for special treatment. What this special treatment is to be is clearly

---

[4] My opinion of this balancing process, when applied as here to justify direct abridgments of First Amendment freedoms, has been fully expressed in previous cases. See, *e. g., Barenblatt* v. *United States,* 360 U. S. 109, 141–146 (dissenting opinion), *Beauharnais* v. *Illinois,* 343 U. S. 250, 268–270, 274–275 (dissenting opinion).

shown by the brief filed before this Court in this appeal by the State Attorney General himself, who administers the Act. That brief states unequivocally that "[t]hose who voluntarily and knowingly appear with, consult with, confer with, attend functions with and otherwise act in concert with Communists or former Communists in America cannot possibly have any reasonable .right of privacy in regard to such activities . . . ." [5] In the light of all these new facts, the decision upon the former appeal is not and cannot properly be held to be dispositive of the question whether *this* record shows that New Hampshire is unconstitutionally imposing a bill of attainder upon Dr. Uphaus.

I think the summary dismissal of this appeal without even so much as the benefit of oral argument, when the abridgment of the rights of free speech and assembly is so obvious, is a sad indication of just how far this Court has already departed from the protections of the Bill of Rights and an omen of things yet to come. Such retrogression, of course, follows naturally from the Court's recent trend toward substituting for the plain language of the commands of the Bill of Rights elastic concepts which permit the Court to uphold direct abridgments of liberty unless the Court views those abridgments as "arbitrary," "unreasonable," "offensive to decency" or "unjustified on balance," [6] for these concepts reduce the absolute commands of the Constitution to mere admonitions. I think it is time for all who cherish the liberties guaranteed by the Bill of Rights to look closely at the disastrous consequences upon those liberties which have resulted from the

---

[5] Thus, the case falls squarely within the holding of this Court in *United States* v. *Lovett,* 328 U. S. 303, 315–316, in that it imposes special pains and penalties upon an easily ascertainable group.

[6] See, *e. g., Beauharnais* v. *Illinois,* 343 U. S. 250; *Rochin* v. *California,* 342 U. S. 165; *American Communications Assn.* v. *Douds,* 339 U. S. 382.

Court's use of such concepts. The present case graphically illustrates those consequences when it is stripped of the ambiguous legal formulations which have been imposed upon it and considered in the context in which it actually arose—the conduct of Dr. Uphaus as an individual.

He is a citizen of this country by birth. Throughout the nearly seventy years of his life, evidently from early boyhood, he has been a deeply religious person. The record shows his active membership in and official service for various Methodist churches in the communities where he has lived. The value of that membership and those services is attested by affidavits filed by the pastors of those churches. The record further indicates, without dispute, that he is a man whose life has been dedicated to the principles of his religion. He holds a degree as a Doctor of Theology. He taught religious education at Yale University and was associated with the Religion and Labor Foundation for a number of years. Over the years, his religious faith manifested itself in an increasing opposition to war. It was this belief which led him, in 1952, to become the Director of World Fellowship, Inc., a summer camp operated, he says, in the interest of promoting the ideas of pacifism.

Almost immediately upon his arrival at World Fellowship, Dr. Uphaus came under the fire of an investigation being conducted by the Attorney General of New Hampshire, apparently on the theory that World Fellowship was frequented by "subversive" persons. Eventually, as the Director of World Fellowship, he was called before the Attorney General to testify. At the very outset of the hearing before the Attorney General, he expressed a complete willingness to answer any question concerning himself, including any views he might hold or any actions he might have taken with regard to any subject. In addition, he expressed a willingness to give the Attorney General any information which might be wanted in regard to

the subject matter of any speeches made at World Fellowship. But he absolutely refused to give the Attorney General: (1) a list of the nonprofessional employees of the camp; (2) a list of all the guests who had stayed at the camp; and (3) his personal correspondence with the speakers who had appeared at the camp. Upon being met with this refusal, the Attorney General sought a court order requiring Dr. Uphaus to produce these items. At the resulting hearing, the court, apparently viewing the request of the Attorney General for the names of the camp's dishwashers and floor sweepers as totally unreasonable and being uncertain as to the legal amenability to subpoena of the correspondence, ordered Dr. Uphaus to produce only the names of the guests. This, Dr. Uphaus persisted, he could not do, resting his refusal upon the following reasons, to which he has adhered throughout this long ordeal: (1) because "by the direct teachings of the Bible . . . it is wrong to bear false witness against my brother; and in as much as I have no reason to believe that any of these persons whose names have been called for have in any sense hurt this state or our country, I have reason to believe that they should not be in the possession of the Attorney General"; (2) because "the social teachings of the Methodist Church teach us clearly and specifically that we in the United States should stand up and uphold civil and religious rights; and in particular, it condemns guilt by association"; [7] and (3) because "I love

---

[7] At the hearing upon remand of these proceedings to the New Hampshire courts following this Court's affirmance of the first contempt order, Dr. Uphaus expanded this second reason to encompass the teachings of all religions. Relying upon a recent article by a Professor of Church History at Harvard University, Williams, Reluctance To Inform, 14 Theology Today 229, Dr. Uphaus argued that his position with respect to informing against his friends is required by the historic traditions of all religions. That article pointed to the indisputable truth that religious groups have time and again resorted to a refusal to inform as a shield against persecution.

this document [the Bill of Rights] and I propose to uphold it with the full strength and power of my spirit and intelligence."

Nonetheless, the order to produce was upheld and Dr. Uphaus was imprisoned for his failure to comply with it. As a result, he has been in jail since last December 14 under a judgment which sentenced him to imprisonment for one year or until such time as he would comply with the order to produce. His plight, however, is even worse than would normally be indicated by that sentence in that there can be no assurance at all that he will be released at the end of the year specified. The Attorney General of New Hampshire insists, notwithstanding the recent legislation reducing his powers, that he has a right to continue all investigations presently pending, and the Supreme Court of New Hampshire apparently agrees with him. This Court, by its action today, necessarily takes the position that this serious abridgment of the rights of free speech and peaceable assembly does not even raise a substantial federal question. As a result, it is entirely possible that Dr. Uphaus will be subjected to new questioning and forced into a new "contempt" as soon as he serves out this year's imprisonment. The brief filed by the Attorney General of New Hampshire makes it appear that he has every intention of doing just that. Thus, a distinct possibility exists that this man who, at least so far as these records show, has never committed a single crime, nor even so much as an immoral act, faces imprisonment for the rest of his life. This simply because he has refused to violate his religious principles and sacrifice his constitutional rights by disclosing the names of those with whom he has peaceably assembled to discuss public affairs in this country.

In this respect, the predicament of Dr. Uphaus may be likened to that of the defendant in the famous *Sheriff's*

*Case* before the House of Lords in 1767.[8]  There the City of London sought to prosecute a religious dissenter for refusing to serve in the office of sheriff as required by its by-laws.  The defense was that the Corporation Act[9] would have made it a crime for a dissenter to serve in that office for it required an oath from all officeholders that they had taken the sacraments of the Church of England within the year.  The dilemma of the dissenter was vividly described by Lord Mansfield in stating his views on the case:

> "Make a law to render them incapable of office; make another, to punish them for not serving. . . . If they accept, punish them; if they refuse, punish them; if they say, yes, punish them; if they say, no, punish them.  My Lords, this is a most exquisite dilemma, from which there is no escaping; it is a trap a man cannot get out of; it is as bad persecution as the bed of Procrustes: If they are too short, stretch them; if they are too long, lop them." [10]

This technique of putting unorthodox groups into a position where their only real choice is between various alternative punishments (a technique the prevalence of which today extends far beyond the borders of New Hampshire) is strikingly similar to that being utilized here against Dr. Uphaus.  If he testifies, his friends will suffer; if he refuses to testify, he goes to jail.  The dilemma is truly one "from which there is no escaping" for a man who, like Dr. Uphaus or like the religious dissenter in the *Sheriff's Case,* cannot bring himself to sacrifice either his religious principles or his legal rights.

---

[8] *Harrison* v. *Evans*, 1 Eng. Rep. 1437.

[9] 13 Charles II, c. I.

[10] Lord Mansfield's statement does not appear in the report of the case cited above.  It is, however, fully reproduced in The Palladium of Conscience, a collection of writings on religious liberty, at 142, 153.

That case also serves to highlight a most unfortunate aspect of the decision in this case. For there, nearly two hundred years ago and in England where there was no Bill of Rights, the House of Lords refused to countenance the use of that technique. They held it to be inconsistent with the Toleration Act [11] by which Parliament had guaranteed religious freedom even though the terms of that guarantee were far less sweeping and more limited in application than the absolute commands of our First Amendment. In my view, the majority's disposition of this case, reducing as it does those absolute commands to mere admonitions, means that our First Amendment amounts to something less as a charter of freedom than England's Toleration Act was held to be. This in the very face of the indisputable historical fact that one of the primary reasons for the establishment of this country was the desire of early settlers to escape religious persecution.

I do not suggest, of course, that this imprisonment of Dr. Uphaus is without precedent in history. Indeed, I am painfully aware that there are a multitude of such precedents extending from many centuries back in the past and continuing forward in an almost unbroken line to the present day. There is, for example, the case of the Puritan minister John Udall in 1590, a case which bears a strong similarity to that of Dr. Uphaus. Udall was called before a court in connection with the investigation of the authorship of certain religious tracts which, in the words of one of the judges, "tend[ed] to the overthrowing of the State, and the moving of Rebellion." [12] That court sought to force Udall to disclose the identity of other Puritans so that it might question them as to the authorship of the tracts. In refusing to divulge the demanded

---

[11] 1 William & Mary, c. XVIII.
[12] 1 Howell's State Trials 1271, 1294.

names, Udall gave his reasons in a statement not unlike that of Dr. Uphaus before the New Hampshire court. "I will take an oath of allegiance to her majesty, wherein I will acknowledge her supremacy according to statute, and promise my obedience as becometh a subject; but to swear to accuse myself or others, I think you have no law for it." [13] Udall, like Dr. Uphaus, was sentenced to jail for civil contempt under a judgment which ordered his imprisonment until such time as he would consent to testify. [14] But such coercion was as ineffective in that case as it has been to date in this. Udall's dauntless spirit was never broken even though his body was. He died in prison within a few years.

It would not be difficult to point out many other cases such as that of Udall, but I will content myself with one other. Some seventy years after John Udall's experiences, there was a dissenting preacher in England named John Bunyan. He was arrested for preaching and efforts were made to get him to agree not to preach any more. He refused to be coerced into silence. The result was that he was put through a kind of trial [15] and sentenced to prison for holding "several unlawful [religious] meetings . . . to the great disturbance and distraction of the

[13] *Id.*, at 1275.

[14] *Id.*, at 1276. Although the term "civil contempt" was not used, the following colloquy reported between Udall and the Bishop of Rochester, one of the judges at his trial, makes it clear that such was the nature of his sentence:

"Roch. The day is past, and we must make an end: will you take the oath?

"U. I dare not take it.

"Roch. Then you must go to prison, and it will go hard with you, for you must remain there until you be glad to take it."

[15] See Bunyan's own report of the events surrounding his imprisonment, A Relation of the Imprisonment of Mr. John Bunyan, in Grace Abounding and The Pilgrim's Progress, at 103–132 (Brown ed., 1907).

good subjects of this kingdom . . . ." [16]   In Bunyan's case
the imprisonment lasted 12 years, and it was during those
12 years that he gave to the world The Pilgrim's Progress.[17]
One of the judges who acquiesced [18] in the imprison-

---

[16] *Id.,* at 114.

[17] Brown, John Bunyan, at 253–262, casts some doubt upon this
traditional version of the genesis of The Pilgrim's Progress by sug-
gesting that it was written, not during this 12 years' imprisonment,
but a few years later during another shorter incarceration.  See, also,
Encyclopædia Britannica, Vol. IV, at 392 (1957 ed.); Dictionary
of National Biography, Vol. III, at 280.

[18] It is difficult to ascertain with precision the extent of Hale's part
in this matter.  He was not one of the judges who conducted such
trial as Bunyan was accorded, which resulted in his prison sentence.
But, several months later, he, with Justice Twisden, was presented
with a petition challenging the legality of Bunyan's conviction and
seeking his release.  The colloquy between Mrs. Bunyan, who pre-
sented that petition, and the two judges is reported in Bunyan, A
Relation of the Imprisonment, *supra,* from which it appears that Hale
was quite sympathetic to Bunyan's plight.  Nonetheless, he refused
to order his release, apparently on the belief that he was powerless
to do so.  Thus he is quoted as having said: "I am sorry, woman,
that I can do thee no good; thou must do one of those three things
aforesaid, namely; either to apply thyself to the King, or sue out
his pardon, or get a writ of error . . . ." *Id.,* at 130.  An accurate
evaluation of the legal correctness of Hale's position is difficult but it
may be pointed out that it is inconsistent with the claim made in
Bunyan's report that his wife had previously petitioned the House
of Lords and had been told that the question of her husband's release
had been placed in the hands of the judges at the next assize (the
assize at which Hale and Twisden were sitting), and also with a
statement attributed to Justice Twisden by that report: "What, will
your husband leave preaching?  If he will do so, then send for him."
*Id.,* at 128.  On the other hand, Judge Hale's refusal to act without
a "writ of error" was consistent with the general judicial attitude of
caution attributed to him in 3 Hallam, The Constitutional History
of England, at 214 (2d ed., 1829).  Hallam there criticized English
lawyers for "dwell[ing] on the authorities of sir Edward Coke and
sir Matthew Hale" in treason cases because "these eminent men, and
especially the latter, aware that our law is mainly built on adjudged

ment of Bunyan was Sir Matthew Hale, later Lord Chief Justice Hale, a man described by Lord Campbell as "one of the most pure, the most pious, the most independent, and the most learned" Chief Justices England ever had.[19] That this description is not entirely unjustified, despite the fact that his record was also marred by the part he took in the conviction and sentencing to death of two unfortunate women as witches,[20] is, I think, a tragic commentary upon the record of the judiciary, during that period, in discharging its duty to protect civil liberties. It is perhaps one of the ironies of history that the name of John Bunyan, a poor tinker and preacher, is at least as well known and respected today as that of the great Chief Justice of England who permitted him to languish in jail.

My guess is that history will look with no more favor upon the imprisonment of Willard Uphaus than it has upon that of Udall, Bunyan or the many others like them. For this is another of that ever-lengthening line of cases where people have been sent to prison and kept there for long periods of their lives because their beliefs were inconsistent with the prevailing views of the moment. I believe the First and Fourteenth Amendments were intended to prevent any such imprisonments in this country. The grounds urged by the Attorney General of New Hampshire here are, as shown by the cases of Udall and Bunyan, precisely those that have always been

precedent, and not daring to reject that which they would not have themselves asserted, will be found to have rather timidly exercised their judgment in the construction of this statute, yielding a deference to former authority which we have transferred to their own." For a sympathetic treatment of Hale's part in the Bunyan case, see 2 Campbell, Lives of the Chief Justices of England, 219–222.

[19] 2 Campbell, Lives of the Chief Justices of England, at 171. See also Burnett, The Life and Death of Sir Matthew Hale; Foss, The Judges of England, at 105–116; Dictionary of National Biography, Vol. VIII, at 902–908.

[20] See 6 Howell's State Trials 687.

urged for throwing dissenters in jail, namely, that they are a menace to the community and it is dangerous to leave them free. It may be true, as the Attorney General of New Hampshire suspects, that Dr. Uphaus has at some time been in the company of Communists, or that the people who have been in his camp have been in the company of Communists. But even if it is true and those associates are as bad as they are suspected to be, it is my belief that our Constitution with its Bill of Rights absolutely forbids the imposition of pains and penalties upon him for peaceably assembling with them. That great charter was drafted by men who were well aware of the constant danger to individual liberty in a country where public officials are permitted to harass and punish people on nothing more than charges that they associate with others labeled by the Government as publicans and sinners.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

I would note jurisdiction in this case for several reasons.

*First.* Dr. Uphaus is in prison for civil contempt for failure to deliver to a state investigating agency lists which he claims are constitutionally protected from disclosure. On June 8, 1959, we affirmed his conviction in the state courts of New Hampshire by a divided vote. *Uphaus* v. *Wyman,* 360 U. S. 72. Following the remand in that case, Uphaus was given a further hearing at which questions never before presented to us were raised. The law under which Uphaus is committed was N. H. Laws 1953, c. 307; N. H. Laws 1955, c. 197, c. 340, directing the Attorney General "to determine whether subversive persons . . . are presently located within this state." That law, however, no longer exists. For in 1957 the authority of the Attorney General of New Hampshire was limited to

making investigations of violations of law. N. H. Laws 1957, c. 178. As respects this change in legislation, the New Hampshire Supreme Court on June 27, 1960, said:[1]

> "Our opinion of March 31, 1960,[2] did not turn upon any holding that RSA 588:8a provided an extension of the legislative investigation first authorized in 1953. The plaintiff stands committed for refusal, while Laws 1955, c. 197, was still in effect, to comply with an order entered prior to enactment of RSA 588:8a."

The majority conclude that this is a ruling on local law only and therefore presents no federal question. That plainly would be right if this were a commitment for criminal contempt and if it may be constitutionally imposed. The expiration of a law normally would be no defense to violations committed while it was in force. But this is a case of civil contempt used for its coercive authority to make the defendant produce the documents which were demanded. In such a case the defendant carries the keys to freedom in his own pocket, as pointed out in *Uphaus* v. *Wyman, supra,* 81. But the requirement to produce assumes that their production is relevant to some interest of the State. As stated in *Uphaus* v. *Wyman, supra,* at 78:

> "What was the interest of the State? The Attorney General was commissioned to determine if there were any subversive persons within New Hampshire. The obvious starting point of such an inquiry was to learn what persons were within the State. It is therefore clear that the requests relate directly to the Legislature's area of interest, *i. e.*, the presence of subversives in the State, as announced in its resolution."

---

[1] *Uphaus* v. *Wyman*, 102 N. H. 517, 518, 162 A. 2d 611, 612.
[2] *Wyman* v. *Uphaus*, 102 N. H. 461, 159 A. 2d 160.

That interest no longer exists, by reason of the statutory change that I have noted. The Supreme Court of New Hampshire in its opinion of June 27, 1960, quoted above, concedes that it does not rely on "an extension of the legislative investigation first authorized in 1953." 102 N. H., at 518, 162 A. 2d, at 612. In other words, the Attorney General is no longer authorized to investigate whether "subversive persons" are present in the State. That is to say, the answers are no longer relevant to any existing legislative project.

Thus a new and important question is presented in this second appeal which is now filed with us. May a person be incarcerated for civil contempt for failure to produce documents to a legislative committee when the committee is no longer authorized to investigate the matter? If, of course, the 1957 Act extended this authority respecting pending cases, the conclusion of the majority that the question is a local, nonfederal one, so far as the contempt issue is concerned, would obviously be correct. But the opinion of the Supreme Court of New Hampshire rendered June 27, 1960, rejects that construction of the New Hampshire statutes. It treats the offense as completed while the earlier Act was in force. I can read its opinion of June 27, 1960, to mean only that it considered the case as if it involved criminal rather than civil contempt. For the criteria it considered relevant have no apparent pertinency when an issue of civil contempt is tendered.

Are the principles announced in *Uphaus* v. *Wyman, supra,* applicable to criminal as well as to civil contempt? Perhaps so. But the careful delineation of the issues in that case made by my Brother CLARK, who wrote for the majority, restricts the case to civil contempt. As appellant states in his brief, the conditional nature of a civil contempt order "makes tolerable the omission, from civil contempt proceedings, of many of the procedural

safeguards with which criminal proceedings are hedged about . . . ." Are the due process problems no different when the prisoner, who invokes the First Amendment, can go to prison for 10 years or for life and when he has the keys to the prison in his own pocket? If the two cases are not different, then local law questions decide the case. But we should not decide without argument that there is no difference in due process terms between the two cases.

The Supreme Court of New Hampshire in its June 27, 1960, opinion stresses that the point now pressed was "not presented in the pending proceedings at any time, until first advanced before the Superior Court on December 14, 1959, the day on which the order of committal was entered." 102 N. H., at 518, 162 A. 2d, at 612. That seems to be true. But no waiver of the point appears to have been made. It is true that at the hearing counsel for Uphaus stated that his client had a legal duty to comply.

> "Your Honor please, it is not our purpose to deny that Willard Uphaus is under legal obligation to answer the question which has been propounded to him. We have explained to him his legal obligation, and he understands it. It is our contention that this is a real matter of conscience; that he feels bound to a higher obligation even than the direction of the court . . . . We are not contending at all that he is not obligated to answer the question."

But the transcript makes clear that the attorneys for Uphaus made two separate points. First, they argued that the 1957 amendment to the statute deprived the Attorney General of his power to investigate the presence of "subversive persons" in New Hampshire and therefore that commitment for civil contempt was no longer permissible. A motion to dismiss on that ground was argued and denied, an exception being noted. As a second and separate point, evidence was offered and argument made

concerning the duration of the sentence. It was during the presentation of this point that the statement, now claimed to be a waiver, was made. Whether imprisonment for civil contempt can constitutionally be imposed in light of the statutory changes affecting the "area of interest" of the legislature, *Uphaus* v. *Wyman, supra,* at 78, and the Attorney General's powers is a question which never has been waived. It is earnestly pressed. Moreover, if there is now no basis for civil contempt, is criminal contempt constitutionally available? These are substantial questions never resolved, as far as I know, in any of our prior decisions.

*Second.* Recently, when Alabama asked the National Association for the Advancement of Colored People to disclose its membership list, we held that disclosure was not required because, if compelled, it might well abridge the rights of members to engage in lawful association in support of their common beliefs. We said in *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 462:

"It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. When referring to the varied forms of governmental action which might interfere with freedom of assembly, it said in *American Communications Assn.* v. *Douds,* [339 U. S. 382], at 402: 'A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature.' Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order.

> Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs. Cf. *United States v. Rumely,* [345 U. S. 41], at 56–58 (concurring opinion)."

What we there said was not designed, as I understood it, as a rule for Negroes only. The Constitution favors no racial group, no political or social group. The group with which Dr. Uphaus was associated and whose membership list he refused to disclose is entitled under the First Amendment to the same protection as the N. A. A. C. P. No groundwork whatever was laid in any of the records before us that World Fellowship, Inc., was at any time engaged in any conduct that could be called unlawful.

We had *N. A. A. C. P.* v. *Alabama, supra,* before us when the *Uphaus* case was decided. It involved rights of the organization itself to defy those who wanted its membership lists. Not until later, however, did we have the case where an *individual* who possessed membership lists challenged the right of government to demand their production. In *Bates* v. *Little Rock,* 361 U. S. 516, decided after we handed down our decision in the *Uphaus* case, we reversed a state conviction of custodians of the records of local branches of N. A. A. C. P. for refusing to disclose its membership lists to city officials. We said:

> "On this record it sufficiently appears that compulsory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members. There was substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm.

> There was also evidence that fear of community hostility and economic reprisals that would follow public disclosure of the membership lists had discouraged new members from joining the organizations and induced former members to withdraw. This repressive effect, while in part the result of private attitudes and pressures, was brought to bear only after the exercise of governmental power had threatened to force disclosure of the members' names. *N. A. A. C. P.* v. *Alabama,* 357 U. S., at 463. Thus, the threat of substantial government encroachment upon important and traditional aspects of individual freedom is neither speculative nor remote." *Id.,* 523–524.

Can there be any doubt that harassment of members of World Fellowship, Inc., in the climate prevailing among New Hampshire's law-enforcement officials will likewise be severe?[3] Can there be any doubt that its members will be as closely pursued as might be members of N. A. A. C. P. in some communities? If either N. A. A. C. P. or World Fellowship were engaged in criminal activity, we would have a different problem. But neither is shown to be. World Fellowship, so far as this record shows, is as law-abiding as N. A. A. C. P. The members of one are entitled to the same freedom of speech, of press, of assembly, and of association as the members of the other. These rights extend even to Communists, as a unanimous Court held in *De Jonge* v. *Oregon,* 299 U. S. 353.[4]

---

[3] The Attorney General of New Hampshire in the motion to dismiss in this case states, "Those who voluntarily and knowingly appear with, consult with, confer with, attend functions with and otherwise act in concert with Communists or former Communists in America cannot possibly have any reasonable right of privacy in regard to such activities . . . ."

[4] Chief Justice Hughes wrote for the Court in that case:

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and vio-

What is an unconstitutional invasion of freedom of association in Alabama or in Arkansas should be unconstitutional in New Hampshire. All groups—white or colored—engaged in lawful conduct are entitled to the same protection against harassment as the N. A. A. C. P. enjoys. Since we allowed in the *Bates* case the protection we deny here and since *Bates* was decided after we decided Uphaus' case, we should reconsider our earlier decision in this case. The *Bates* case and the *Uphaus* case put into focus for the first time the responsibility of an *individual* to make disclosure of membership lists. We cannot administer justice with an even hand if we allow Bates to go free and Uphaus to languish in prison.

For these reasons, as well as those advanced by Mr. Justice Black, which I wholly share, I would note probable jurisdiction of this appeal. And Dr. Uphaus should, of course, be released on bail pending resolution of the questions by the Court.

---

lence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.

"It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects." 299 U. S., at 365.