**Carl BRADEN, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 17705.**

United States Court of Appeals Fifth Circuit.

Dec. 10, 1959.

Rehearing Denied Jan. 12, 1960.

654

John M. Coe, Pensacola, Fla., Conrad J. Lynn, Leonard B. Boudin, New York City, C. Ewbank Tucker, Louisville, Ky., for appellant. Victor Rabinowitz, New York City, of counsel.

J. Robert Sparks, Asst. U. S. Atty., Charles D. Read, Jr., Acting U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The appellant, Carl Braden, was convicted of each of the six counts of an indictment charging contempt of Congress under 2 U.S.C.A. § 192,[1] arising from his refusal to answer certain questions at a hearing of a Subcommittee of the Committee on Un-American Activities of the House of Representatives. He has appealed from the conviction.

Complying with a subpoena, the appellant appeared before the Subcommittee in Atlanta, Georgia. He was accompanied by two attorneys. After being sworn the appellant identified himself as Field Secretary of the Southern Conference Fund, Inc., which, he said, was "a southwide interracial organization working to bring about integration, justice and decency in the South." He was also the associate editor of the Southern Patriot, a newspaper published by the Southern Conference Educational Fund which, said the appellant, "disseminates information on integration in the South and about the people who are working for integration." The appellant testified that the subpoena of the Committee had been served on him while he was visiting in Rhode Island. In reply to a question of counsel for the Committee, he stated that he was visiting Harvey O'Connor, National Chairman of the Emergency Civil Liberties Committee. He was asked to state the point from which he departed to the State of Rhode Island. The appellant expressed the belief that the question was not pertinent to any question that the Committee might be investigating, and that the question was an invasion of his right to associate under the First Amendment. He declined to answer. The Committee counsel gave the appellant an explanation of the pertinency of the question, saying:

"Sir, it is our understanding that you are now a Communist, a member of the Communist Party; that you have been identified by reputable, responsible witnesses under oath as a Communist, part of the Communist Party which is a tentacle of the international Communist conspiracy. It is our information further, sir, that you as a Communist have been propagating the Communist activity and the Communist line principally in the South; that you have been masquerading behind a facade of humanitarianism; that you have been masquerading behind a facade of emotional appeal to certain segments of out society; that your purpose, objective, your activities, are designed to further the cause of the international Communist conspiracy in the United States.

---

1. "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

"Now, there is pending before the Committee on Un-American Activities pursuant to its authority, its duty, and its responsibility legislation. Indeed, the chairman of the Committee on Un-American Activity sometime ago introduced a bill, H.R.9937, which has numerous provisions which are being considered by the Committee on Un-American Activities. Some of these provisions undertake to tighten the security laws respecting the registration of communists; some of these provisions undertake to tighten the security laws respecting the dissemination of communist propaganda. Some of these security laws preclude certain types of activities, the very nature of which we understand you have been engaged in.

"In addition to that, sir, there is pending before the Committee on Un-American Activities a series of proposals that are not yet incorporated into legislative form, which the committee is considering. In addition to that, the Committee on Un-American Activities has a mandate from the Congress of the United States to maintain a surveillance over the administration and operation of numerous security laws that are presently on the statute books, including the Internal Security Act [50 U.S.C.A. § 781 et seq.], the Communist Control Act of 1954 [50 U.S.C.A. § 841 et seq.], the Foreign Agents Registration Act [22 U.S.C.A. § 611 et seq.], espionage and sabotage statutes.

"It is for that reason and for these reasons which I have just described to you that this committee has come to Atlanta, Georgia, for the purpose of assembling factual material which the committee can use, in connection with other material which it has assembled, in appraising the administration and operation of the laws and in making a studied judgment upon whether or not the current provisions of the laws are adequate and whether or not each or any of these proposals pending before the committee should be recommended for enactment.

"If you, sir, now will tell us, in response to the last outstanding principal question, where you have been immediately prior to your sojourn in Rhode Island with Harvey O'Connor, who has been identified as a hard-core member of the communist conspiracy, head of the Emergency Civil Liberties Committee, another organization that has been cited by a Congressional Committee as a communist front."

The Chairman of the Subcommittee ruled that a foundation had been laid establishing the pertinency of the question and directed the appellant to answer. The appellant again refused to answer stating that his beliefs and his associations were none of the business of the Committee and asserting that his refusal to answer was "on the grounds of the first amendment of the United States Constitution, which protects the rights of all citizens to practice beliefs and associations, freedom of the press, freedom of religion, and freedom of assembly." He declined to answer many other questions upon the same grounds; adding as an additional ground a claim that the mandate of the Committee was so vague that the subjects it was authorized to investigate could not be determined. The appellant was asked if he was in the Atlanta area in December of 1957, and he gave an affirmative answer. He was then asked, "And did you participate in a meeting here at that time?" He refused to answer and the refusal is charged as an offense by Count One of the indictment. After the appellant had testified that it was a matter of public record that the Southern Conference Educational Fund met in the American Red Cross Building in Atlanta in December, 1957, he was asked, "Who

solicited the quarters to be made available to the Southern Conference Educational Fund?" The refusal to answer this question forms the basis of Count Two of the indictment.

Committee Counsel asked the appellant, "Now sir, are you connected with the Emergency Civil Liberties Committee?" He declined to answer and this question is the subject matter of Count Three. He was asked, "Did you and Harvey O'Connor, in the course of your conferences there in Rhode Island, develop plans and strategies outlining work schedules for the Emergency Civil Liberties Committee?" The appellant's refusal to answer this question resulted in Count Four of the indictment.

The appellant was shown a letter [2] on the letterhead of Southern Conference Educational Fund. He admitted that it bore the signatures of his wife and himself. He was asked, "Were you a member of the Communist Party the instant you affixed your signature to that letter?"

The refusal to answer this question is the charge of Count Five.

Counsel for the Committee stated to the appellant:

"Eugene Feldman—who lives in Chicago, Illinois. He is the editor of the Southern Newsletter. We had him before the Committee yesterday, at which time we displayed to him the application for a post office box made on behalf of the Southern Newsletter, a publication which is developed in Chicago, which is sent to a post office box in Louisville, Kentucky, and then mailed out over the South."

After this statement the appellant was asked, "I would just like to ask you whether or not you, being a resident of Louisville, Kentucky, have anything to do with the Southern News Letter?" The appellant refused to answer this question on the ground that it was an attempted invasion of the freedom of the press as well as the grounds assigned for the refusal to answer the other questions. This refusal to answer is the basis for the charge contained in Count Six.

The appellant moved to dismiss the indictment which motion was overruled and denied. The appellant also filed a motion for a bill of particulars in which the request was made that the Government

2. "Dear Friend:

"We are writing to you because of your interest in the Kentucky 'sedition' cases, which were thrown out of Court on the basis of a Supreme Court decision declaring state sedition laws inoperative.

"There are now pending in both houses of Congress bills that would nullify this decision. We understand there is a real danger that these bills will pass.

"We are especially concerned about this because we know from our own experience how such laws can be used against people working to bring about integration in the South. Most of these state statutes are broad and loosely worded, and to the officials of many of our Southern states integration is sedition. You can imagine what may happen if every little local prosecutor in the South is turned loose with a state sedition law.

"It is small comfort to realize that such cases would probably eventually be thrown out by the Supreme Court. Be-

fore such a case reaches the Supreme Court, the human beings involved have spent several years of their lives fighting off the attack, their time and talents have been diverted from the positive struggle for integration, and money needed for that struggle has been spent in a defensive battle.

"It should also be pointed out that these bills to validate state sedition laws are only a part of a sweeping attack on the U. S. Supreme Court. The real and ultimate target is the Court decisions outlawing segregation. Won't you write your senators and your congressman asking them to oppose S. 654, S. 2646, and H.R. 977. Also ask them to stand firm against all efforts to curb the Supreme Court. It is important that you write— and get others to write—immediately, as the bills may come up at any time.

"Cordially yours,
 "Carl and Anne Braden"

"1. State the question under inquiry as to which each of the questions set forth in Counts One through Six is alleged to be pertinent.

"2. State the manner in which each of the questions set forth in Counts One through Six is alleged to be pertinent to the question under inquiry referred to in item 1 above."

There was apparently no order entered on the motion for a bill of particulars. The Government, however, filed a Bill of Particulars as to the information sought in Request Number 1 of the motion in these words:

"The question under inquiry by the Subcommittee of the House Committee on Un-American Activities, on July 30, 1958, as alleged in the indictment, as to which each of the questions set out in Counts 1 through 6 of this indictment is alleged to be pertinent, was:

" 'The extent, character and objects of Communist colonization and infiltration in the textile and other basic industries located in the South, Communist Party propaganda activities in the South, and entry and dissemination within the United States of foreign Communist Party propaganda.' "

No objection was made as to the sufficiency of the bill of particulars as a response to the first request nor was the court asked to require the Government to respond to the second request contained in the motion.

Following the verdict of guilty upon each of the six counts, concurrent sentences of twelve months imprisonment on each of the counts were imposed. Motions in arrest of judgment and for a new trial were made and denied.

■ The assertion is made on behalf of the appellant that he was not called before the Committee for any legislative purpose but rather for the purpose of harassing and exposing him because of his support of integration and civil rights and his opposition to the Committee and to pending legislation. Investigations can be made by the Congress only as to matters which are proper subjects for legislation by it. There is no congressional power to expose for the sake of exposure. Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Barenblatt v. United States, 360 U.S. 109, 79 S. Ct. 1081, 3 L.Ed.2d 1115. The opening statement of the Committee Chairman showed a purpose of investigating current subversive Communist techniques in the South. Legislative purposes might well be furthered by a determination of whether organizations ostensibly active in championing timely objectives, such as integration and civil rights, are in fact being used for the spread of the propaganda of a foreign dominated Communist organization with subversive designs upon our governmental system. If a Congressional Committee ascertained that Communists were attempting to create an appearance of respectability for Un-American activities by seeking the shelter of such an honored and honorable institution as the American Red Cross, that fact would be pertinent to the inquiry it was making.

■ There was a close relationship shown between the appellant and Harvey O'Connor, who was known to the Committee as a hard-core member of the Communist Party. O'Connor was identified as the National Chairman of the Emergency Civil Liberties Committee which was stated to be a Communist front organization. The activities of that organization, with which the appellant would have been familiar if he was associated with O'Connor in the development for it of plans and strategies, were pertinent to the investigation being made by the Committee.

■ We need not make any analysis of the pertinency of the questions upon which other counts of the indictment were based. The sustaining of the appellant's conviction on any of the counts would require an affirmance since con-

current sentences were imposed. Barenblatt v. United States, supra; Davis v. United States, 6 Cir., 1959, 269 F.2d 357; Estep v. United States, 5 Cir., 1955, 223 F.2d 19, certiorari denied 350 U.S. 862, 76 S.Ct. 105, 100 L.Ed. 765; Gilmore v. United States, 5 Cir., 1955, 228 F.2d 121; Morales v. United States, 5 Cir., 1956, 228 F.2d 762.

While before the Committee, the appellant's refusals to answer were frequently accompanied by statements or suggestions that the Committee's purpose was the investigation of integration. But one who is known or believed to be a Communist and is suspected of being engaged in Un-American activities does not acquire immunity by adopting the role of a racial integrationist.

■ During the appearance of the appellant before the Committee he stated his claim of right in refusing to answer the Committee's questions by saying, "I am standing on the Watkins,[3] Sweezy,[4] Konigsberg,[5] and other decisions of the Supreme Court which protect my right, and the Constitution as they interpret the Constitution of the United States to private belief and association." Again he said, "I also believe it is an invasion of my right to associate under the first amendment and I therefore decline to answer." This position, taken at the Committee hearing is renewed here. It is apparent that the appellant misconceived the effect of the Watkins case. That this is so is clearly demonstrated by the opinion in the Barenblatt case from which we quote these excerpts:

"Undeniably, the First Amendment in some circumstances protects an individual from being compelled to disclose his associational relationships. However, the protections of the First Amendment, unlike a proper claim of the privilege against self-incrimination under the Fifth Amendment, do not afford a witness the right to resist inquiry in all circumstances. When First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown. * * *

"That Congress has wide power to legislate in the field of Communist activity in this Country, and to conduct appropriate investigations in aid thereof, is hardly debatable. The existence of such power has never been questioned by this Court, and it is sufficient to say, without particularization, that Congress has enacted or considered in this field a wide range of legislative measures, not a few of which have stemmed from recommendations of the very Committee whose actions have been drawn in question here. In the last analysis this power rests on the right of self-preservation, 'the ultimate value of any society,' Dennis v. United States, 341 U.S. 494, 509, 71 S.Ct. 857, 867, 95 L.Ed. 1137. Justification for its exercise in turn rests on the long and widely accepted view that the tenets of the Communist Party include the ultimate overthrow of the Government of the United States by force and violence, a view which has been given formal expression by the Congress.

* * * * *

"We conclude that the balance between the individual and the governmental interests here at stake must be struck in favor of the latter, and that therefore the provisions of the First Amendment have

---

**3.** Watkins v. United States, supra.

**4.** Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311.

**5.** Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810, rehearing denied 354 U.S. 927, 77 S.Ct. 1374, 1 L.Ed.2d 1441.

not been offended." 360 U.S. 109, 126, 127–128, 134, 79 S.Ct. 1081, 1091.

The foregoing principles are applicable and controlling here. The First Amendment does not give to the appellant any right to refuse to answer the questions which were propounded to him by the Committee.

■ The district court decided that the questions upon which the indictments were framed were pertinent and so instructed the jury. The appellant, at the close of the trial, objected and made the contention that the pertinency issues should have been submitted to the jury. The same contention is urged on this appeal. We have no doubt but that this question is one of law and was rightly resolved at the trial. Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692.

■ Before this Court the appellant says his conviction must be reversed because, after he had made his objections to the questions put to him, he was not expressly directed to answer the questions. After the question on which the first count of the indictment was asked, the appellant said "Again the first amendment; same grounds, sir. Do I have to repeat it each time, or is it understood each time?" The Chairman replied that "It is understood that you are referring to the first amendment." The Staff Director suggested that if there was to be an understanding as to the basis for refusing to answer, there might also be an understanding as to directions to the appellant to answer. The Chairman asked the appellant if he understood that he was ordered to answer and the appellant replied, "I will understand that you are directing me to answer each question in order to expedite the matter so we will not be wasting the Committee's time and everybody else's time on this." Later the Staff Director inquired whether the record was clear that in response to each refusal to answer there had been given a direction to answer, and the

appellant said, "I understand. My counsel and I understand." The appellant waived the right to have a specific direction to answer each of the questions to which he made objection and which he refused to answer. He now asserts that he could not waive the requirement of being specifically directed to answer each question. It is required that the witness be ordered to answer a question, where an objection has been made or a refusal to answer has been stated. This requirement is made so that it may be established beyond doubt, in a criminal prosecution, that the refusal was intentional and deliberate. The statements of the appellant clearly showed that he and his counsel were fully informed and the request to omit the specific directions to answer was intelligently made by the appellant. He was in no way prejudiced. Due process was in no way denied. If the waiver had been made at a trial before a court we are without doubt that no assignment of error could properly be predicated upon permitting the waiver. Smith v. United States, 5 Cir., 1956, 234 F.2d 385; Beeler v. United States, 5 Cir., 1953, 205 F.2d 454, certiorari denied 346 U.S. 877, 74 S.Ct. 130, 98 L.Ed. 385; Hagans v. United States, 5 Cir., 1959, 261 F.2d 924. We see no interest of justice that calls for a different rule here. It might, though, be observed that the First Count upon which the appellant was convicted was for refusal to answer a question after being expressly ordered to give an answer. It follows, as has been stated, that if the conviction on the First Count is upheld there will be an affirmance in view of the concurrent sentences imposed.

■ The appellant now urges that when he appeared before the Committee the rules as announced in the Watkins opinion justified his belief that the First Amendment protected him in refusing to answer the questions of the Committee; and being so justified he did not have the criminal intent necessary to sustain a conviction for contempt. The

offense is the willful refusal to comply with the order of the Committee to answer a pertinent question. The mistaken belief that the law justifies a refusal to answer is not a defense, whether the belief is induced by the misreading of a judicial opinion, by the advice of counsel or otherwise. Sinclair v. United States, supra.

■■■■ The appellant would have us hold that the indictment should have specified the pertinency of each question and would have us reverse his conviction for insufficiency of the indictment. A comparison of the indictment here with that by which Barenblatt was charged will show the lack of merit in this contention. Cf. Barenblatt v. United States, 1957, 100 U.S.App.D.C. 13, 240 F.2d 875, 877. The appellant also urges that the trial court should have ordered a full response to the requests in the motion for a bill of particulars. We think that the appellant, if he regarded the bill of particulars as inadequate, should have said so in an appropriate manner before going to trial. But aside from that, we think there would have been no error if the court had expressly denied the request contained in the motion. The purpose of a bill of particulars is either to supplement the indictment in informing a defendant of facts constituting ingredients of the offense with which he is charged in order that he may prepare his defense or so to perfect the record as to bar a subsequent prosecution. 4 Wharton, Criminal Law and Procedure 720, § 1867. Pertinency being, as has been shown, a matter of law, the manner in which the questions propounded are pertinent to the inquiry are not proper matters for a bill of particulars. Rose

v. United States, 9 Cir., 1945, 149 F.2d 755. It cannot be well contended that the appellant could have been twice tried for the offenses charged in the indictment. We cannot see, and the appellant does not advise us, how the preparation of his defense would have been helped by any information he sought by the second part of his Motion for a Bill of Particulars. The absence of any order directing the furnishing of any further bill of particulars was not error. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Kaufman v. United States, 6 Cir., 1947, 163 F.2d 404, certiorari denied 333 U.S. 857, 68 S.Ct. 726, 92 L.Ed. 1137, rehearing denied 333 U.S. 878, 68 S.Ct. 896, 92 L.Ed. 1154. Cf. Watts v. United States, 5 Cir., 1947, 161 F.2d 511, certiorari denied 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354.

■■■ Finally, the appellant took and takes the position that the Congress had no power to authorize the Committee investigations and that its Rule XI [6] under which the investigation here challenged was conducted was so vague and ambiguous that it could have no constitutional validity. This contention has also been put at rest by the Supreme Court in the Barenblatt decision. In the opinion, after reviewing the history of the Committee, the Court held:

"In this framework of the Committee's history we must conclude that its legislative authority to conduct the inquiry presently under consideration is unassailable, and that independently of whatever bearing the broad scope of Rule XI may have on the issue of 'pertinency' in a given investigation into Communist activities, as in Watkins, the Rule cannot be said to

6. "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries

or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." H.Res. 5, 83d Cong., 1st Sess.; H.Res. 7, 86th Cong., 1st Sess.

be constitutionally infirm on the score of vagueness." 360 U.S. 109, 122–123, 79 S.Ct. 1081, 1091.

The quoted language is applicable here and the principle stated forecloses the appellant's contention.

We do not find any error in the judgment and sentence or in the proceedings culminating therein. The judgment and sentence are

Affirmed.