# BRADEN v. UNITED STATES.

No. 54. Argued November 17, 1960.—Decided February 27, 1961.

*Leonard B. Boudin* and *John M. Coe* argued the cause for petitioner. With them on the brief were *Victor Rabinowitz, Conrad J. Lynn, Samuel M. Koenigsberg* and *Charles A. Reich.*

*Assistant Attorney General Yeagley* argued the cause for the United States. With him on the briefs were *Solicitor General Rankin, Bruce J. Terris, George B. Searls, Joseph C. Weixel* and *Kevin T. Maroney.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This case is a companion to *Wilkinson* v. *United States,* decided today, *ante,* p. 399. The petitioner was the witness immediately preceding Wilkinson at the hearing of a subcommittee of the House Un-American Activities Committee, in Atlanta, Georgia, on July 30, 1958. He refused to answer many of the questions directed to him, basing his refusal upon the grounds that the questions were not pertinent to a question under inquiry by the subcommittee and that the interrogation invaded his First Amendment rights. He was subsequently indicted and, after a jury trial, convicted for having violated 2 U. S. C. § 192, in refusing to answer six specific questions which had been put to him by the subcommittee.[1] The Court of Appeals affirmed, 272 F. 2d 653, relying on *Barenblatt* v. *United States,* 360 U. S. 109, and we granted certiorari, 362 U. S. 960.

The principal issues raised by the petitioner are substantially identical to those considered in *Wilkinson,* and extended discussion is not required in resolving them. Based upon the same record that was brought here in *Wilkinson,* we conclude for the reasons stated there that

---

[1] The indictment was in six counts, each count setting out a specific question which the petitioner had refused to answer. He was convicted on all six counts, and concurrent sentences were imposed.

the subjects under subcommittee investigation at the time the petitioner was interrogated were Communist infiltration into basic southern industry and Communist Party propaganda activities in the southern part of the United States. We conclude for the same reasons that the subcommittee's investigation of these subjects was authorized by Congress, that the interrogation was pertinent to a question under subcommittee inquiry,[2] and that the petitioner was fully apprised of its pertinency.[3]

In asserting a violation of his First Amendment rights, the petitioner here points out that he was asked, not simply whether he was or had been a Communist Party mem-

---

[2] The questions which were the subjects of the six counts of the indictment were as follows:

"And did you participate in a meeting here at that time?

"Who solicited the quarters to be made available to the Southern Conference Educational Fund?

"Are you connected with the Emergency Civil Liberties Committee?

"Did you and Harvey O'Connor, in the course of your conference there in Rhode Island, develop plans and strategies outlining work schedules for the Emergency Civil Liberties Committee?

"Were you a member of the Communist Party the instant you affixed your signature to that letter?

"I would just like to ask you whether or not you, being a resident of Louisville, Kentucky, have anything to do there with the Southern Newsletter?"

The full transcript of the petitioner's interrogation by the subcommittee, introduced in the District Court, makes intelligible the relevance of these questions. Since concurrent sentences were imposed on the several counts, we need specifically consider here only the question covered by the fifth count, going to the petitioner's Communist Party membership. See *Barenblatt* v. *United States,* 360 U. S. 109, 115; *Claassen* v. *United States,* 142 U. S. 140, 147.

[3] As in *Wilkinson,* by the resolution authorizing the subcommittee's investigation, by the statements of the Chairman and other members of the subcommittee, by the tenor of interrogation of prior witnesses, and by a lengthy explanatory statement addressed contemporaneously to the petitioner.

434

ber, as in *Wilkinson* and *Barenblatt, supra,* but whether he was a member "the instant you affixed your signature to that letter." The letter in question, which had admittedly been signed by the petitioner and his wife, urged opposition to certain bills in Congress. The petitioner emphasizes that the writing of such a letter is not only legitimate but constitutionally protected activity, and points to other evidence in the record to indicate that he had been active in other completely legitimate causes.[4] Based upon these circumstances, he argues that the subcommittee did not have a proper legislative purpose in calling him before it, but that it was bent rather on persecuting him for publicly opposing the subcommittee's

---

[4] For example, the petitioner points out that the "Southern Conference Educational Fund" with which he had been associated had been active in promoting racial integration in the South. The transcript of the subcommittee hearings makes clear, however, that these activities as such were not under investigation. As a member of the subcommittee stated:

"What I am interested in, is what are you doing on behalf of the Communist Party? We are not going to be clouded, so far as I am concerned, by talking about integration and segregation. This committee is not concerned in that. This committee is concerned in what you are doing in behalf of the Communist conspiracy."
At another point the following colloquy occurred:

"Mr. Braden: Two hundred Negro leaders in the South petitioned the Congress of the United States last week in connection with this hearing in Atlanta.

"Mr. Jackson: After looking at some of the names on this list, the letters went into the circular files of many members, because it was quite obvious that a number of names on that letter were names of those that had been closely associated with the Communist Party. Their interest and major part does not lie with honest integration. Their interest lies with the purposes of the Communist Party. And that is what we are looking into, and let us not be clouding this discussion and this hearing this morning by any more nonsense that we are here as representatives of the United States Government to further, or to destroy, or to have anything to do with, integration."

activities. He contends that under such circumstances an inquiry into his personal and associational conduct violated his First Amendment freedoms. On these grounds, the petitioner would differentiate the constitutional issues here from those that were before the Court in *Barenblatt, supra.*

But *Barenblatt* did not confine congressional committee investigation to overt criminal activity, nor did that case determine that Congress can only investigate the Communist Party itself. Rather, the decision upheld an investigation of Communist activity in education. Education, too, is legitimate and protected activity. Communist infiltration and propaganda in a given area of the country, which were the subjects of the subcommittee investigation here, are surely as much within its pervasive authority as Communist activity in educational institutions. The subcommittee had reason to believe that the petitioner was a member of the Communist Party, and that he had been actively engaged in propaganda efforts. It was making a legislative inquiry into Communist Party propaganda activities in the southern States. Information as to the extent to which the Communist Party was utilizing legitimate organizations and causes in its propaganda efforts in that region was surely not constitutionally beyond the reach of the subcommittee's inquiry. Upon the reasoning and authority of *Barenblatt,* 360 U. S., at 125–134, we hold that the judgment is not to be set aside on First Amendment grounds.

The petitioner in this case raises two additional issues that were not considered either in *Barenblatt, supra,* or in *Wilkinson, supra.* First, he says that it was error for the trial court not to leave it for the jury to determine whether the questions asked by the subcommittee were pertinent to the subject under inquiry. Secondly, he asserts that

he could not properly be convicted, because in refusing to answer the subcommittee's questions he relied upon his understanding of the meaning of previous decisions of this Court. We think that both of these contentions have been foreclosed by *Sinclair* v. *United States,* 279 U. S. 263.

At the trial the district judge determined as a matter of law that the questions were pertinent to a matter under inquiry by the subcommittee,[5] leaving to the jury the question whether the pertinence of the questions had been brought home to the petitioner. It is to be noted that counsel made no timely objection to this procedure and, indeed, affirmatively acquiesced in it.[6] But we need not base rejection of the petitioner's contention here on that ground, for, in any event, it was proper for the court to determine the question as a matter of law. This is precisely what was held in *Sinclair* v. *United States,* where the Court said at 279 U. S. 299: "The reasons for holding relevancy and materiality to be questions of law . . .

---

[5] "You will note that each count in the indictment alleges that the refusal was with reference to a question pertinent to the matter under inquiry. You will not concern yourselves with this allegation as it involves a matter of law which it is the Court's duty to determine and which has been determined. I have determined as a matter of law that the committee had the right to ask these questions and the defendant had the duty to answer these questions under the conditions that I will later explain."

[6] In his opening statement to the jury, counsel for the petitioner said: "As the counsel for the government has properly stated, the question of whether or not those questions were pertinent to the subject matter under inquiry has been ruled to be a question of law for the Court. But whether or not the defendant Carl Braden at the time he refused to answer those questions knew that they were pertinent to the subject matter under inquiry is a question of fact which will be submitted by the Court to you gentlemen." Not until after the concluding arguments and the instructions to the jury did counsel claim for the first time that the question of actual pertinency was not for the court to decide.

apply with equal force to the determination of pertinency arising under § 102 [the predecessor of 2 U. S. C. § 192]. The matter for determination in this case was whether the facts called for by the question were so related to the subjects covered by the Senate's resolutions that such facts reasonably could be said to be 'pertinent to the question under inquiry.' It would be incongruous and contrary to well-established principles to leave the determination of such a matter to a jury."

During his interrogation the petitioner was asked: "Now do I understand that you have refused to answer the question as to whether or not you are now a member of the Communist Party solely upon the invocation of the provisions of the first amendment, but that you have not invoked the protection of the fifth amendment to the Constitution. Is that correct?" He gave the following answer: "That is right, sir. I am standing on the Watkins, Sweezy, Konigsberg, and other decisions of the United States Supreme Court which protect my right, and the Constitution as they interpret the Constitution of the United States, protecting my right to private belief and association."

It is now argued that because he relied upon his understanding of this Court's previous decisions he could not be convicted under the statute for failing to answer the questions. An almost identical contention was also rejected in *Sinclair* v. *United States, supra,* at 299: "There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel. The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt. There was no misapprehension as to what was called for. The refusal to answer was deliber-

ate. The facts sought were pertinent as a matter of law, and § 102 made it appellant's duty to answer. He was bound rightly to construe the statute. His mistaken view of law is no defense." [7]

Here, as in *Sinclair,* the refusal to answer was deliberate and intentional.

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

The petitioner in this case, as is shown by the facts set forth in the dissenting opinion of MR. JUSTICE DOUGLAS, in which I concur, has for some time been at odds with strong sentiment favoring racial segregation in his home State of Kentucky. A white man himself, the petitioner has nonetheless spoken out strongly against that sentiment. This activity, which once before resulted in his being charged with a serious crime,[1] seems also to have

---

[7] This was reaffirmed in *United States* v. *Murdock,* 290 U. S. 389, 397, where it was said: "The applicable statute did not make a bad purpose or evil intent an element of the misdemeanor of refusing to answer, but conditioned guilt or innocence solely upon the relevancy of the question propounded. Sinclair was either right or wrong in his refusal to answer, and if wrong he took the risk of becoming liable to the prescribed penalty." See also *Watkins* v. *United States,* 354 U. S. 178, 208.

[1] In 1954 petitioner and his wife were indicted and petitioner was convicted of sedition by the State of Kentucky, for which he received a sentence of imprisonment for 15 years. This prosecution grew out of events surrounding petitioner's helping a Negro family to purchase a home in an all-white suburb of Louisville. The charges against petitioner and his wife were eventually dismissed following this Court's decision in *Pennsylvania* v. *Nelson,* 350 U. S. 497. See *Braden* v. *Commonwealth of Kentucky,* 291 S. W. 2d 843. For the prosecution's version of this case, see the testimony of the State Attorney General and the Commonwealth Attorney for Louisville (the latter having served as prosecutor in the case) before the Subcommittee to Investigate the Administration of the Internal Security Act

been the primary reason for his being called before the Un-American Activities Committee. For the occasion of that Committee's compelling petitioner to go from Rhode Island, where he was vacationing, to Atlanta for questioning appears from the record to have been the circulation of two letters, both in the nature of petitions to Congress, urging that certain legislative action be taken which, in the view of the signers of the petitions, would help those working against segregation. One of these petitions, signed by petitioner and his wife, asked those who read it to urge their representatives in Congress to vote against proposed legislation which would have empowered the States to enact antisedition statutes because, in the view of the signers, those statutes could too readily be used against citizens working for integration. The other petition, bearing the signature of 200 southern Negroes, was sent directly to the House of Representatives and requested that body not to allow the Un-American Activities Committee to conduct hearings in the South because, so the petition charged, "all of its [the Committee's] activities in recent years suggest that it is much more interested in harassing and labeling as 'subversive' any citizen who is inclined to be liberal or an independent thinker." The record shows that the Committee apparently believed that petitioner had drafted both of these petitions and that he had circulated them, not—as would appear from the face of the petitions—for the purpose of furthering the cause of integration, but for the purpose of furthering the interests of the Communist Party, of which the Committee claimed to have information that he was a member,[2] by fomenting racial strife and interfer-

and other Internal Security Laws of the Senate Committee on the Judiciary, 85th Cong., 1st Sess., pp. 2–23. For the Bradens' version of the case, see Anne Braden, The Wall Between.

[2] So far as appears from the record, the evidence relied upon by the Committee to substantiate its claim that petitioner is or has

ing with the investigations of the Un-American Activities Committee.

When petitioner appeared in response to this subpoena, he was asked a number of questions regarding his personal beliefs and associations, culminating in the question of whether he was a member of the Communist Party at "the instant" he affixed his signature to the petition urging defeat of the statute authorizing state antisedition laws. Petitioner refused to answer these questions on the grounds, first, that the Committee had no power to ask the questions it put to him, and, secondly, that he could properly refuse to answer such questions under the First Amendment. For this refusal to answer he, like Frank Wilkinson who followed him on the witness stand at the Atlanta hearing,[3] was convicted under 2 U. S. C. § 192 and sentenced to 12 months in jail.[4] And, as was the case with the conviction of Wilkinson, the majority here affirms petitioner's conviction "[u]pon the reasoning and authority" of *Barenblatt* v. *United States.*[5]

Again I must agree with the majority that insofar as the conviction is attacked on constitutional grounds,[6] the

been a member of the Communist Party is no stronger here than it was in *Wilkinson* v. *United States,* the companion case decided today, *ante,* p. 399. Here, as there, the Committee appears to have been relying upon a flat conclusory statement made by an informant, this time before a Senate Internal Security Subcommittee. See Hearings before the Subcommittee, *op. cit., supra,* n. 1, at 37.

[3] See *Wilkinson* v. *United States,* decided today, *ante,* p. 399.

[4] Petitioner was convicted on six counts and given concurrent sentences on each, but the majority, properly I think, states that "we need specifically consider here only the question covered by the fifth count . . . ." The fifth count related to the question referred to above dealing with petitioner's possible Communist Party membership at "the instant" he affixed his signature to the petition urging defeat of the statute authorizing state antisedition laws.

[5] 360 U. S. 109.

[6] As indicated by my concurrence in the dissent of MR. JUSTICE DOUGLAS noted above, I think the issue of the pertinency of the ques-

decision in *Barenblatt* constitutes ample authority for its action, even though it cannot be denied that the Committee's conduct constitutes a direct abridgment of the right of petition. Indeed, I think the majority might well have, with equal justification, relied upon a much earlier decision of this Court, that in *Beauharnais* v. *Illinois*.[7] For it was there that a majority of this Court first applied to the right of petition the flexible constitutional rule upon which the decision in this case is based— the rule that the right of petition, though guaranteed in precise and mandatory terms by the First Amendment, may be abandoned at any time Government can offer a reason for doing so that a majority of this Court finds sufficiently compelling. Ironically, the need there asserted by the State of Illinois and accepted by a majority of this Court as sufficiently compelling to warrant abridgment of the right of petition was the need to protect Negroes against what was subsequently labeled "libel . . . of a racial group," [8] although it was actually nothing more than the circulation of a petition seeking governmental and public support for a program of racial segregation.[9] Thus, the decision in *Beauharnais* had all the outward appearances of being one which would aid the underprivileged Negro minority.[10] This decision, however, is a dramatic illustration of the shortsightedness of such an interpretation of that case. For the very constitutional philosophy that

---

tions asked here should be controlled by the decision in *Watkins* v. *United States,* 354 U. S. 178, rather than by the decision in *Barenblatt* v. *United States,* 360 U. S. 109.

[7] 343 U. S. 250.

[8] *Id.,* at 263.

[9] See the petition itself, reprinted as an Appendix to my dissenting opinion in that case. *Id.,* at 276.

[10] MR. JUSTICE DOUGLAS and I did not think so. See, *id.,* at 275: "If there be minority groups who hail this holding as their victory, they might consider the possible relevancy of this ancient remark:
" 'Another such victory and I am undone.' "

gave birth to *Beauharnais* today gives birth to a decision which may well strip the Negro of the aid of many of the white people who have been willing to speak up in his behalf. If the House Un-American Activities Committee is to have the power to interrogate everyone who is called a Communist,[11] there is one thing certain beyond the peradventure of a doubt—no legislative committee, state or federal, will have trouble finding cause to subpoena all persons anywhere who take a public stand for or against segregation. The lesson to be learned from these two cases is, to my mind, clear. Liberty, to be secure for any, must be secure for all—even for the most miserable merchants of hated and unpopular ideas.

Both *Barenblatt* and *Beauharnais* are offspring of a constitutional doctrine that is steadily sacrificing individual freedom of religion, speech, press, assembly and petition to governmental control. There have been many other such decisions and the indications are that this number will continue to grow at an alarming rate. For the presently prevailing constitutional doctrine, which treats the First Amendment as a mere admonition, leaves the liberty-giving freedoms which were intended to be protected by that Amendment completely at the mercy of Congress and this Court whenever a majority of this Court concludes, on the basis of any of the several judicially created "tests" now in vogue,[12] that abridgment

---

[11] And I think the decision in this case, as well as that in *Wilkinson* v. *United States,* also decided today, *ante,* p. 399, demonstrates conclusively that the Committee is to have at least that much power.

[12] These "tests" include whether the law in question "shocks the conscience," offends "a sense of justice," runs counter to the "decencies of civilized conduct," is inconsistent with "an ordered concept of liberty," offends "traditional notions of fair · play and substantial justice," is contrary to "the notions of justice of English-speaking peoples," or is unjustified "on balance." See *Rochin* v. *California,* 342 U. S. 165, 175–176 (concurring opinion); *Uphaus* v. *Wyman,* 364

of these freedoms is more desirable than freedom itself. Only a few days ago, the application of this constitutional doctrine wiped out the rule forbidding prior censorship of movies in an opinion that leaves the door wide open to, if indeed it does not actually invite, prior censorship of other means of publication.[13] And the Blackstonian condemnation of prior censorship had long been thought, even by those whose ideas of First Amendment liberties have been most restricted, to be the absolute minimum of the protection demanded by that Amendment.[14]

I once more deny, as I have found it repeatedly necessary to do in other cases, that this Nation's ability to preserve itself depends upon suppression of the freedoms of religion, speech, press, assembly and petition.[15] But I do believe that the noble-sounding slogan of "self-preservation"[16] rests upon a premise that can itself destroy any

U. S. 388, 392–393 (dissenting opinion). Significantly, in none of these "tests" does the result to be obtained depend upon the question whether there has been an abridgment of rights protected by the plain language of the Bill of Rights.

[13] *Times Film Corp.* v.. *City of Chicago,* 365 U. S. 43.

[14] See, *e. g.,* Levy, Legacy of Suppression, at 13–15, 173, 185, 186, 190, 202–220, 241, 248, 258, 262, 263, 283, 288, 289, 293, 307 and 309.

[15] See, *e. g., American Communications Assn.* v. *Douds,* 339 U. S. 382, 452–453 (dissenting opinion); *Dennis* v. *United States,* 341 U. S. 494, 580 (dissenting opinion); *Barenblatt* v. *United States,* 360 U. S. 109, 145–153, 162 (dissenting opinion); *Flemming* v. *Nestor,* 363 U. S. 603, 628 (dissenting opinion); *Uphaus* v. *Wyman,* 364 U. S. 388, 400–401 (dissenting opinion).

[16] The use of this slogan is becoming commonplace in the opinions of this Court. Thus, in *Dennis* v. *United States,* 341 U. S. 494, at 509, it was said: "Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, for if a society cannot protect its very structure from armed internal attack, it must follow that no subordinate value can be protected." Then, in *Barenblatt* v. *United States,* 360 U. S. 109, at 127–128, we

democratic nation by a slow process of eating away at the liberties that are indispensable to its healthy growth. The very foundation of a true democracy and the foundation upon which this Nation was built is the fact that government is responsive to the views of its citizens, and no nation can continue to exist on such a foundation unless its citizens are wholly free to speak out fearlessly for or against their officials and their laws. When it begins to send its dissenters, such as Barenblatt, Uphaus, Wilkinson, and now Braden, to jail, the liberties indispensable to its existence must be fast disappearing. If self-preservation is to be the issue that decides these cases, I firmly believe they must be decided the other way. Only by a dedicated preservation of the freedoms of the First Amendment can we hope to preserve our Nation and its traditional way of life.

It is already past the time when people who recognize and cherish the life-giving and life-preserving qualities of the freedoms protected by the Bill of Rights can afford to sit complacently by while those freedoms are being destroyed by sophistry and dialectics. For at least 11 years, since the decision of this Court in *American Communications Assn.* v. *Douds*,[17] the forces of destruction have been hard at work. Much damage has already been done. If this dangerous trend is not stopped now, it may be an impossible task to stop it at all. The area set off for individual freedom by the Bill of Rights was marked by boundaries precisely defined. It is my belief that the area so set off provides an adequate minimum protection for the freedoms indispensable to individual liberty.

---

are told: "In the last analysis this power rests on the right of self-preservation, 'the ultimate value of any society,' " a statement which is reiterated today in *Wilkinson* v. *United States, ante,* p. 399.

[17] 339 U. S. 382, decided in 1950. And see *Uphaus* v. *Wyman,* 364 U. S. 388, 392 (dissenting opinion).

Thus we have only to observe faithfully the boundaries already marked for us. For the present, however, the two cases decided by this Court today and the many others like them that have been decided in the past 11 years have all but obliterated those boundaries.[18] There are now no limits to congressional encroachment in this field except such as a majority of this Court may choose to set by a value-weighing process on a case-by-case basis.

I cannot accept such a process. As I understand it, this Court's duty to guard constitutional liberties is to guard those liberties the Constitution defined, not those that may be defined from case to case on the basis of this Court's judgment as to the relative importance of individual liberty and governmental power. The majority's approach makes the First Amendment, not the rigid protection of liberty its language imports, but a poor flexible imitation. This weak substitute for the First Amendment is, to my mind, totally unacceptable for I believe that Amendment forbids, among other things, any agency of the Federal Government—be it legislative, executive or judicial—to harass or punish people for their beliefs, or for their speech about, or public criticism of, laws and public officials. The Founders of this Nation were not then willing to trust the definition of First Amendment freedoms to Congress or this Court, nor am I now. History and the affairs of the present day show that the Founders were right. There are grim reminders all

[18] See, *e. g., American Communication Assn.* v. *Douds,* 339 U. S. 382; *Dennis* v. *United States,* 341 U. S. 494; *Garner* v. *Board of Public Works of Los Angeles,* 341 U. S. 716; *Adler* v. *Board of Education of New York City,* 342 U. S. 485; *Beauharnais* v. *Illinois,* 343 U. S. 250; *Galvan* v. *Press,* 347 U. S. 522; *Yates* v. *United States,* 354 U. S. 298; *Uphaus* v. *Wyman,* 360 U. S. 72; *Barenblatt* v. *United States,* 360 U. S. 109; *Nelson* v. *County of Los Angeles,* 362 U. S. 1; *Flemming* v. *Nestor,* 363 U. S. 603; *Uphaus* v. *Wyman,* 364 U. S. 388; and *Times Film Corp.* v. *City of Chicago,* 365 U. S. 43.

around this world that the distance between individual liberty and firing squads is not always as far as it seems. I would overrule *Barenblatt,* its forerunners and its progeny, and return to the language of the Bill of Rights. The new and different course the Court is following is too dangerous.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

At the bottom of this case are this Court's decisions in *Pennsylvania* v. *Nelson,* 350 U. S. 497, holding that Congress did not entrust to the States protection of the Federal Government against sedition, and *Brown* v. *Board of Education,* 347 U. S. 483, holding that racial segregation of students in public schools is unconstitutional. I had supposed until today that one could agree or disagree with those decisions without being hounded for his belief and sent to jail for concluding that his belief was beyond the reach of government.

On June 17, 1957, we decided *Watkins* v. *United States,* 354 U. S. 178, defining and curtailing the authority of Congressional Committees who sought the aid of the courts in holding witnesses in contempt.[1] We said in a

---

[1] In that case the witness testified freely about himself but balked at talking about others:

"I am not going to plead the fifth amendment, but I refuse to answer certain questions that I believe are outside the proper scope of your committee's activities. I will answer any questions which this committee puts to me about myself. I will also answer questions about those persons whom I knew to be members of the Communist Party and whom I believe still are. I will not, however, answer any questions with respect to others with whom I associated in the past. I do not believe that any law in this country requires me to testify about persons who may in the past have been Communist Party members or otherwise engaged in Communist Party activity but

six-to-one decision that "when First Amendment rights are threatened, the delegation of power to the committee must be clearly revealed in its charter" (*id.,* at 198); that "there is no congressional power to expose for the sake of exposure" (*id.,* at 200); that the meaning of "un-American" in the Resolution defining the Committee's authority is so vague that it is "difficult to imagine a less explicit authorizing resolution" (*id.,* at 202); that before a witness chooses between answering or not answering he is entitled "to have knowledge of the subject to which the interrogation is deemed pertinent" (*id.,* at 208–209); that in that case the Resolution and the statement of the Committee's chairman were "woefully inadequate to convey sufficient information as to the pertinency of the questions to the subject under inquiry." *Id.,* 215.

*Sweezy* v. *New Hampshire,* 354 U. S. 234, decided the same day as the *Watkins* case, reversed a conviction arising out of a state investigation into "subversive activities" where a teacher was asked questions concerning his relation to Marxism. THE CHIEF JUSTICE in his opinion stated:

> "Equally manifest as a fundamental principle of a democratic society is political freedom of the individual. Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This

who to my best knowledge and belief have long since removed themselves from the Communist movement.

"I do not believe that such questions are relevant to the work of this committee nor do I believe that this committee has the right to undertake the public exposure of persons because of their past activities. I may be wrong, and the committee may have this power, but until and unless a court of law so holds and directs me to answer, I most firmly refuse to discuss the political activities of my past associates."

right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." *Id.,* 250–251.

The concurring opinion stated:

"Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic perplexities. For society's good—if understanding be an essential need of society—inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise

government and the people's well-being, except for reasons that are exigent and obviously compelling." *Id.*, 261–262.

On June 8, 1959—two years after the *Watkins* and *Sweezy* decisions—we decided *Barenblatt* v. *United States*, 360 U. S. 109, where a divided Court gave only slight consideration to the type of pertinency claim that was raised in *Watkins, Sweezy* and the present case, in part because it could rely on the petitioner's failure to raise that objection before the Committee. See *Barenblatt* v. *United States, supra,* 123–125.

Petitioner, who was called as a witness by the Committee in July 1958, which was even before *Barenblatt* was decided, refused to answer, relying on the *Watkins* and *Sweezy* decisions "as they interpret the Constitution of the United States, protecting my right to private belief and association."

I think he was entitled to rely on them. The Act under which he stands convicted states that a witness is guilty if he "wilfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry." 2 U. S. C. § 192. A refusal to answer was held in *Sinclair* v. *United States*, 279 U. S. 263, 299, not to be justified because one acted in good faith, the Court saying, "His mistaken view of the law is no defense." Yet no issue concerning the First Amendment was involved in the *Sinclair* case. When it is involved, as it is here, the propriety of the question in terms of pertinency should be narrowly resolved.

The Resolution under which the Committee on Un-American Activities acted in this case [2] is precisely the

---

[2] The Resolution provides in relevant part:

"The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda

same as the one involved in *Watkins* v. *United States,
supra.* We said concerning it, "It would be difficult to
imagine a less explicit authorizing resolution. Who
can define the meaning of 'un-American'? What is
that single, solitary 'principle of the form of govern-
ment as guaranteed by our Constitution'? . . . At one
time, perhaps, the resolution might have been read nar-
rowly to confine the Committee to the subject of prop-
aganda. The events that have transpired in the fifteen
years before the interrogation of petitioner make such a
construction impossible at this date." 354 U. S., at 202.

We emphasized the need, when First Amendment rights
were implicated, to lay a foundation before probing that
area. The authority of the Committee must then
"be clearly revealed in its charter." *Id.,* at 198. The
"specific legislative need" must be disclosed. *Id.,* at 205.
The pertinency of the questions and the subject matter
under inquiry must be made known "with the same degree
of explicitness and clarity that the Due Process Clause
requires in the expression of any element of a criminal
offense." *Id.,* at 209.

After *Watkins* anyone was entitled to rely on those
propositions for protection of his First Amendment rights.
The conditions and circumstances under which the ques-
tions were asked petitioner plainly did not satisfy the
requirements specified in *Watkins.*

The setting of the six questions [3] which were asked peti-
tioner and which he refused to answer shows nothing more

activities in the United States, (2) the diffusion within the United
States of subversive and un-American propaganda that is instigated
from foreign countries or of a domestic origin and attacks the prin-
ciple of the form of government as guaranteed by our Constitution,
and (3) all other questions in relation thereto that would aid Congress
in any necessary remedial legislation."

[3] Petitioner was convicted on each of six counts of an indictment
and sentenced to serve 12 months on each count, the sentences to

than an exercise by him of First Amendment rights of speech and press and of petition to Congress. It was not shown that these activities were part of a matrix for the overthrow of government. It was not shown—unless the bare word of the Committee is taken as gospel—that these constitutional activities had any relation whatever to communism, subversion, or illegal activity of any sort or kind. It was not shown where and how the Committee was ever granted the right to investigate those who petition Congress for redress of grievances.

Petitioner and his wife were field secretaries of an organization known as the Southern Conference Educational Fund. Prior to the committee hearing at Atlanta, Georgia, they wrote a letter [4] on the letterhead of the

---

run concurrently. Therefore if any one of the counts can be sustained an affirmance would be necessary. See *Claassen* v. *United States*, 142 U. S. 140, 147.

[4] "Dear Friend:

"We are writing to you because of your interest in the Kentucky 'sedition' cases, which were thrown out of Court on the basis of a Supreme Court decision [*Pennsylvania* v. *Nelson, supra*] declaring state sedition laws inoperative.

"There are now pending in both houses of Congress bills that would nullify this decision. We understand there is real danger that these bills will pass.

"We are especially concerned about this because we know from our own experience how such laws can be used against people working to bring about integration in the South. Most of these state statutes are broad and loosely worded, and to the officials of many of our Southern states integration is sedition. You can imagine what may happen if every little local prosecutor in the South is turned loose with a state sedition law.

"It is small comfort to realize that such cases would probably eventually be thrown out by the Supreme Court. Before such a case reaches the Supreme Court, the human beings involved have spent several years of their lives fighting off the attack, their time and talents have been diverted from the positive struggle for integra-

Southern Conference urging people to write their Congressmen and Senators to oppose three bills pending before the Congress which would, to use their words, "nullify" a decision of this Court "declaring state sedition laws inoperative." They added "We are especially concerned about this because we know from our own experience how such laws can be used against people working to bring about integration in the South. Most of these state statutes are broad and loosely worded, and to the officials of many of our Southern states integration is sedition. You can imagine what may happen if every little prosecutor in the South is turned loose with a state sedition law."

Also prior to the Committee hearing in Atlanta, a group of Negroes petitioned Congress against the proposed Atlanta investigation of the House Committee on Un-American Activities. That petition stated:

> "We are informed that the Committee on Un-American Activities of the House of Representatives is planning to hold hearings in Atlanta, Georgia, at an early date.
>
> "As Negroes residing in Southern states and the District of Columbia, all deeply involved in the

tion, and money needed for that struggle has been spent in a defensive battle.

"It should also be pointed out that these bills to validate state sedition laws are only a part of a sweeping attack on the U. S. Supreme Court. The real and ultimate target is the Court decisions outlawing segregation. Won't you write your two senators and your congressman asking them to oppose S. 654, S. 2646, and H. R. 977. Also ask them to stand firm against all efforts to curb the Supreme Court. It is important that you write—and get others to write—immediately as the bills may come up at any time.

"Cordially yours,
"CARL AND ANNE BRADEN,
"Field Secretaries."

struggle to secure full and equal rights for our people, we are very much concerned by this development.

"We are acutely aware of the fact that there is at the present time a shocking amount of un-American activity in our Southern states. To cite only a few examples, there are the bombings of the homes, schools, and houses of worship of not only Negroes but also of our Jewish citizens; the terror against Negroes in Dawson, Ga.; the continued refusal of boards of registrars in many Southern communities to allow Negroes to register and vote; and the activities of White Citizens Councils encouraging open defiance of the United States Supreme Court.

"However, there is nothing in the record of the House Committee on Un-American Activities to indicate that, if it comes South, it will investigate these things. On the contrary, all of its activities in recent years suggest that it is much more interested in harassing and labeling as 'subversive' any citizen who is inclined to be liberal or an independent thinker.

"For this reason, we are alarmed at the prospect of this committee coming South to follow the lead of Senator Eastland, as well as several state investigating committees, in trying to attach the 'subversive' label to any liberal white Southerner who dares to raise his voice in support of our democratic ideals.

"It was recently pointed out by four Negro leaders who met with President Eisenhower that one of our great needs in the South is to build lines of communication between Negro and white Southerners. Many people in the South are seeking to do this. But if white people who support integration are labeled 'subversive' by congressional committees, terror is spread among our white citizens and it becomes increasingly difficult to find white people who are

willing to support our efforts for full citizenship. Southerners, white and Negro, who strive today for full democracy must work at best against tremendous odds. They need the support of every agency of our Federal Government. It is unthinkable that they should instead be harassed by committees of the United States Congress.

"We therefore urge you to use your influence to see that the House Committee on Un-American Activities stays out of the South—unless it can be persuaded to come to our region to help defend us against those subversives who oppose our Supreme Court, our Federal policy of civil rights for all, and our American ideals of equality and brotherhood."

Petitioner was charged by the Committee with preparing that petition; counsel for the Committee later stated that the purpose of the petition was "precluding or attempting to preclude or softening the very hearings which we proposed to have here." The Committee said that it was not concerned with integration. It said that "A number of names on that letter were names of those who had been closely associated with the Communist Party. Their interest and major part does not lie with honest integration. Their interest lies with the purposes of the Communist Party. And that is what we are looking into . . . ."

Two of the questions which petitioner refused to answer pertained to the Southern Conference, the first one being "Did you participate in a meeting here at that time?" And the second one was "Who solicited quarters to be made available to the Southern Conference Educational Fund?"

Two other questions which petitioner refused to answer related to the Emergency Civil Liberties Committee. The first of these was "Are you connected with the Emergency

Civil Liberties Committee?" The second one was "Did you and Harvey O'Connor in the course of your conferences there in Rhode Island, develop plans and strategy outlining work schedules for the Emergency Civil Liberties Committee?" The Committee counsel charged that Mr. O'Connor was "a hard-core member of the communist conspiracy, head of the Emergency Civil Liberties Committee."

A fifth question which petitioner refused to answer related to the letter I have previously mentioned [5] which he and his wife sent to the people urging them to write their Senators and Congressmen opposing three bills that would reinstate state sedition laws. The question relating to this letter was "Were you a member of the Communist Party the instant you affixed your signature to that letter?"

The sixth and final question which petitioner refused to answer concerned the Southern Newsletter. Counsel asked if petitioner had "anything to do" with that letter. Petitioner replied "I think you are now invading freedom of the press . . . . I object to your invasion of the freedom of the press, and I also decline to answer the questions on the same grounds. You are not only attacking integrationists, you are attacking the press."

There is nothing in the record to show that the Southern Conference or the Emergency Civil Liberties Committee or the Southern Newsletter had the remotest connection with the Communist Party. There is only the charge of the Committee that there was such a connection. That charge amounts to little more than innuendo. This is particularly clear with respect to the question relating to petitioner's membership in the Communist Party. Having drawn petitioner's attention to the letter

---

[5] *Supra,* note 4.

he had written,[6] counsel for the Committee demanded to know if petitioner was a Communist "the instant you affixed your signature to that letter." No foundation at all had been laid for that question, and from the record no purpose for it appears, save the hope of the Committee to link communism with that letter which supported this Court's decision in *Pennsylvania* v. *Nelson, supra.* This Court, passing on the pertinency issue in *Barenblatt* v. *United States, supra,* 123–125, was careful to emphasize that Barenblatt "had heard the Subcommittee interrogate the witness Crowley along the same lines as he, petitioner, was evidently to be questioned, *and had listened to Crowley's testimony identifying him as a former member of an alleged Communist student organization . . . ."* (Emphasis added.) No such foundation was ever laid here.

One would be wholly warranted in saying, I think, in light of the *Watkins* and *Sweezy* decisions that a Committee's undisclosed information or unsupported surmise would not justify an investigation into matters that on their face seemed well within the First Amendment.[7] If *Watkins* and *Sweezy* decided anything, they decided that

---

[6] See *supra,* note 4.

[7] "The consequences that flow from this situation are manifold. In the first place, a reviewing court is unable to make the kind of judgment made by the Court in *United States* v. *Rumely, supra.* The Committee is allowed, in essence, to define its own authority, to choose the direction and focus of its activities. In deciding what to do with the power that has been conferred upon them, members of the Committee may act pursuant to motives that seem to them to be the highest. Their decisions, nevertheless, can lead to ruthless exposure of private lives in order to gather data that is neither desired by the Congress nor useful to it. Yet it is impossible in this circumstance, with constitutional freedoms in jeopardy, to declare that the Committee has ranged beyond the area committed to it by its parent assembly because the boundaries are so nebulous." 354 U. S., at 204.

before inroads in the First Amendment domain may be made, some demonstrable connection with communism must first be established and the matter be plainly shown to be within the scope of the Committee's authority. Otherwise the Committee may roam at will, requiring any individual to disclose his association with any group or with any publication which is unpopular with the Committee and which it can discredit by calling it communistic.