# CHARLESTON.

SUTHERLAND V. MILLER, JUDGE, et al.

Submitted February 1, 1917.    Decided March 13, 1917.

1. CONSTITUTIONAL LAW—*Judgment—Powers of.*

In so far as sections 15 and 16, ch. 27, Acts 1915 (§8b, ch. 5, Barnes' Code), purport to authorize a judge to whom application is made, as therein provided, to order a judicial inquiry, if in his opinion the interests of public justice require it, to ascertain whether a candidate for United States Senator in person or by agents expended to secure his election money or other things of value in excess of the amount allowed in that chapter sufficient to influence materially the result of the election, and to require the judge to certify his opinion and determination and the evidence adduced before him upon such investigation "to the governor of the state, who shall transmit the same to the proper authorities of the United States government for such action as said authorities may deem proper", they are obnoxious to and conflict with Article V of the Constitution of this state, in that they attempt to empower a member of the judiciary as such to exercise a volition to determine when, to what extent or whether a judicial inquiry into alleged corrupt practices shall be undertaken by him upon such application.    (p. 797).

2. SAME—*Legislative Power—Delegation.*

Such a statute is void also because it attempts to delegate a non-delegable power.  Upon the legislature the people have impliedly conferred authority to determine the exigencies or emergencies that warrant the exercise of police power to promote the general welfare of the citizens of the state; and it can not redelegate to any one the ultimate right to determine when, to what extent and under what circumstances the power may properly be exercised in any given case.    (p. 805).

3. UNITED STATES—*Election of Senators—Validity—Determination.*

In the Senate of the United States, under an express declaration of the Federal Constitution, vests the exclusive power and authority to judge of the election, returns and qualifications of its members, and no other power or body lawfully can interpose or in anywise attempt to control or influence the determination of these questions, or declare void an election held to select such a member.    (p. 808).

Petition by Howard Sutherland, for a writ of prohibition against Hon. James H. Miller, Judge, and others.

*Writ issued.*

*McClintic, Mathews & Campbell,* for petitioner.

*A. M. Belcher* and *T. A. Bledsoe,* for respondents.

LYNCH, PRESIDENT:

As rival candidates in the general election held November 7, 1916, to fill the office of senator of the United States for the state of West Virginia during the term beginning March 4, 1917, William E. Chilton received 138,585 votes and Howard Sutherland 144,243 votes, according to the returns as ascertained in the manner required by law. William E. Chilton, presumably acting upon the hypothesis that §15, ch. 27, Acts 1915 (§8b15, ch. 5, Barnes' Code) was competent to confer the requisite authority therefor, presented to James H. Miller, judge of the ninth judicial circuit, a petition which, after in general terms alleging, but not definitely pointing out, supposed violations by Howard Sutherland and his agents of the provisions of the act known as the corrupt practice act (being ch. 27, Acts 1915), by the expenditure of money and other things of value in excess of the amount thereby permitted to be expended by a candidate for such official position, to such an extent as materially to affect the result of the election so held, prayed an investigation in the nature of a judicial inquiry into the correctness of the charges made in the petition, and the relief prescribed by the act if by proof the judge should think they were sustained.

Sutherland, without appearing thereto for any purpose at the time and place named in the process issued upon the petition and served on him, applied to this court and obtained a rule in prohibition against Chilton and the judge to whom the petition was addressed to require each of them to appear and, if either of them can, to show good cause against the award of a writ to prohibit them from further proceeding upon the aforesaid inquiry.

In response to the rule, they severally appeared, by demurrer and answer to the petition. Judge Miller, without assigning any cause of demurrer, answered thereto, in part in the language of the act, that, "being of the opinion that the interests of public justice required the judicial inquiry prayed for, he authorized such inquiry and directed process

in accordance with the terms and provisions of the act", and averred the non-appearance of Sutherland to object to the petition or answer the charges it preferred. As cause of demurrer, Chilton assigned lack of sufficiency in the allegations of the petition of Sutherland to warrant the award of the prohibitive process, and the qualification and competency of his co-respondent to entertain and determine the inquiry sought to be prohibited; and, for answer, reiterates in brief the charges made in the petition filed by him.

Thus is raised the only vital question: whether, in view of the declaration of article five of the constitution that "the legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others, nor shall any person exercise the powers of more than one of them at the same time", the legislature may delegate to any person empowered to exercise the functions of a judge the determination officially and *ex parte* of what "the interests of public justice require" or do not require. Such, as we perceive, is the very essence of the act out of whose provisions this controversy has arisen. It reads:

"At any time within sixty days after any primary or other election, the attorney general, any prosecuting attorney, any candidate voted for at such election, or any one hundred qualified voters, upon giving bond to indemnify the person whose election is contested from all costs, attorneys' fees and expenses incurred by him in defending his title to office in the event that such person's title to his office is upheld, may present to any circuit judge a petition setting forth under oath, upon information or personal knowledge, that corrupt and illegal practices contrary to the provisions of this act, specifying the same, were committed in connection with such election, naming any candidate as defendant, and praying a judicial inquiry into the alleged facts. If such judge shall be of the opinion that the interests of public justice require such a judicial inquiry, he shall authorize such inquiry. Such petition shall be tried without a jury; the petitioner or petitioners and all candidates at such election shall be entitled to appear and be heard as parties; and the court

shall have power to compel the attendance of witnesses and the production of books and papers which are relevant and material, and all the evidence taken shall be· properly certified and made a part of the record of such proceeding".

The apparent vice of the act, if invalid, reposes in that provision which says, "If such judge shall be of the opinion that the interests of public justice require such a judicial inquiry he shall authorize such inquiry". The implication is irresistible that if he shall be of the opinion that the interests of public justice do not require such a judicial inquiry he shall not authorize it. So that what the interests of public justice require is to be determined, not by that body in which the organic law has vested it, but by a member of a separate and distinct department of the state government to whom the legislature has sought to delegate the exercise of that function.

No authority definitely demarks the exact boundary line beyond which neither department may be deemed to intrude or impinge upon the exclusive prerogatives of either of the other coordinate governmental departments. Such limitation is impossible of delineation. In the enactment of any statute the legislature, in a limited sense, necessarily and properly exercises judgment, discretion and deliberation. It investigates the facts, conditions and circumstances, and from the knowledge or information acquired in that process determines the necessity and propriety of the legislation the object of which is to promote the general welfare of the public whom it represents. Likewise, upon those upon whom the organic law has imposed the duty to execute the laws passed by the legislature devolves the duty of exercising sound judgment in determining the time, place, manner and method and the extent to which and the persons against or in whose favor the laws are to be enforced. Naturally and unavoidably, the exercise of these functions, whether legislative or executive, partakes somewhat of the characteristic quality of a judicial investigation, but does not effect a trespass upon the prerogatives of the judiciary in violation of the constitution.

In the process of determining whether an act of the legislature is invalid, because it falls within the inhibition of the constitution, it is essential always to remember that if a

doubt exists as to its legal competency or validity the doubt must be resolved in support of the legislation. The presumption should be and is in favor of validity. It must be assumed that the law enacting department, whose membership pledged themselves in solemn form to support the constitution, has not lightly disregarded that pledge.

In the chapter cited, the legislature prescribed the limits of expenditures it deemed sufficient to allow candidates for the different official positions to be filled by the electors in any primary or general election conducted in the state or any subdivision thereof, and the punishment to be imposed for an expenditure in excess of that amount. The expenditures or liability incurred by or on behalf of a candidate for membership in the Senate of the United States, in securing his nomination or election, shall not in the aggregate exceed the sum of seventy-five dollars for each of the fifty-five counties in the state; and the punishment to be inflicted for a violation of this provision is the ineligibility of the person convicted to hold the office he is elected to fill, and his disqualification during three years from the date of the conviction to vote or hold any public office or employment. Ch. 5, §8b14, Barnes' Code. Furthermore, in case of a judicial inquiry into corrupt and illegal practices connected with the election of a United States senator, attempted to be provided for in section 15, if the court shall decide that the successful candidate named in such petition in person or through his political agents has committed such practices sufficient to influence the result materially, the election shall be treated as void, in which event another election shall be ordered as required by the act.

In this manner, and as the necessary consequence of the exercise of the right conferred by that section if valid, the privilege of a successful candidate in an election to fill the office of United States senator is made to depend in a large measure, in the first instance, upon the *ex parte* opinion of a single judge, one selected by a candidate defeated in the same election for the same office, supported, finally, it is true, by the conclusion of the judge, based upon the facts proved before him, subject however to the appeal allowed in section 19 of the chapter. The consequences arising out of that determin-

ation are drastic and conclusive, unless reversed on appeal. They avoid the election. This result necessarily flows from the conclusion of a single member of the judiciary, unaided by any express declaration of the legislature enacting the provision as to what "the interests of public justice" may require, unless it be found elsewhere in the act. No such provision or combination of provisions is pointed out by counsel; and we perceive none. True, the act inveighs against corrupt practices in elections. It limits the expenditure of money to influence the choice of candidates for nominations in a primary and their election after the nominations are made. It definitely prescribes the punishment to be inflicted upon conviction for violation of its provisions against excessive expenditures of money and other things of value. Each provision has its complement in the punishment provided for its infringement. For every violation the act, independently of the provision for a judicial inquiry, fixes a penalty, and conviction subjects the offender to the consequences flowing from the commission of the unlawful act. Nowhere does there appear to be a hiatus between violation and penalty. Without the section purporting to authorize a judicial inquiry, the act is certain, complete, unequivocal and unambiguous. Nor anywhere in it is there any positive or explicit legislative definition or ascertainment as to what the "interests of public justice" do or do not require. That definition or ascertainment is left entirely subject to the ex parte opinion of the judge selected by persons who under the supposed authority of the act may determine to put in motion the necessary movement to obtain the judicial inquiry. Such is the only permissible interpretation of the statutory provision. The exercise of the power to determine the propriety of the proceeding is not merely discretionary. In quality it is legislative. It confers the power to determine what the interests of public justice require. What is required to promote justice may or may not be put into operation by a legislative enactment, but when declared by statute its enforcement is not optional when the circumstances demand its exertion by the tribunal to which its enforcement is committed.

Such a requirement results solely from the exercise of that

indeterminate and indefinable power generally denominated the police power, which essentially inheres in all legislative agencies. It is exercised by the state to promote the health, safety, comfort, morals and the general welfare of the public. Whatever tends to promote these elements of human happiness, and to eradicate, so far as may be, noxious agencies that tend unnecessarily to impair the right to enjoy life, liberty and property, fall within the broad scope of that power, as do all statutes that have for their legitimate object the repression of criminal conduct and the prevention of corrupt practices in elections. It is a term which has relation to a power to adopt a system of regulations that tend to promote health, order, convenience and comfort of the public and the prevention and punishment of conduct, professions, trades or callings injurious to society. It is the name given to that inherent sovereignty which it is the right and duty of the government to exercise whenever public policy in a broad sense demands for the benefit of society at large regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires. 8 Cyc. 863. Though the courts may determine what fall within the control of that power, the legislature only can decide when the exigency exists for the exercise of the power; and its determination is conclusive upon the judiciary. *State* v. *Gerhardt*, 145 Ind. 439; *Ritchie* v. *People*, 155 Ill. 82; *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 35; *Boyd* v. *Alabama*, 94 U. S. 645.

Although generally non-delegable because of its sovereign quality, it is firmly established, after repeated challenge, that the legislature may expressly or by necessary implication delegate to municipal corporations to a limited extent the lawful exercise of the police power within their legitimate governmental sphere, the measure of the power conferred being subject to legislative discretion. *Morris* v. *Taylor*, 70 W. Va. 618. But wherever the legislative department has deemed it prudent to bestow such functions on county courts in the establishment and maintenance of public highways, and on municipalities for the government of a limited territory, or on the judiciary as in the incorporation of towns and villages, it

has in each instance definitely defined the circumstances and conditions necessary to serve as the basis for the exercise of the grant, and placed upon the grantee of the power the obligation to determine whether the conditions prescribed exist before attempting to exert the power. In each and every instance of the delegation, the right to exercise the power has vigorously been contested, on the ground of legislative incompetency to bestow upon another body or tribunal that which primarily inheres in it alone. And in no instance has the delegation been sustained where, when the conditions prescribed for the exercise of the grant exist, the exercise is made to depend upon the mere will or caprice of the grantee of the power.

These principles are illustrated by many decisions. The Supreme Court of the United States, in *Yick Wo* v. *Hopkins,* 118 U. S. 356, held invalid, because violative of the federal constitution, a municipal ordinance designed to regulate the business of conducting public laundries in the city of San Francisco, in that it conferred arbitrary power "upon municipal authorities at their own will and without regard to discretion in the legal sense of the term to give or withhold consent as to persons or places and without regard to the competency of the persons applying or the propriety of the place selected for the carrying on of the business". A statute which contains a clause authorizing a county court at its pleasure to suspend the operation of the act after it takes effect is held unconstitutional and void as an unlawful delegation of power in *State* v. *Field,* 17 Mo. 529. An act of the same state conferring upon the board of railroad and warehouse commissioners authority to establish the time and place for the inspection of hay was held invalid in *State* v. *Carlisle,* 235 Mo. 252, as making the inspection to depend solely upon the opinion of the board. Although when circumscribed within definite valid limitations and restrictions powers conferred upon designated public officials to provide rules and regulations for the complete operation and enforcement of a law within its expressed general scope and purpose will be sustained because not unlawful; yet if it attempts to delegate the power to enact a law or modify it, or to exercise an unrestricted discretion in the application of the law, it will not be sustained,

because these are non-delegable legislative functions. *State v. Railway Co.,* 56 Fla. 617.

In so far as an act attempts to empower a person named therein to make and enforce, subject to the approval of certain designated commissioners, rules and regulations in the nature of quarantine for certain purposes, and to declare that a willful violation of the regulations shall be a misdemeanor, it is held in *Ex parte Cox,* 63 Cal. 21, to amount to a delegation of legislative power and as such is unconstitutional. "The legislature had no authority to confer upon the officer or board the power to declare what acts shall constitute a misdemeanor". The same general doctrine is asserted in *Morrow v. Wipf,* 115 N. W. (S. D.) 1121, in interpreting a primary election law which attempted to authorize a county central committee to name delegates from such county, whenever two thirds of its members should decide that there was not a sufficient contest over the election of delegates from the county to the state convention as would justify the expense necessary to be incurred in calling a county convention for such purpose. So, changing the rules as to the time when the liability of a common carrier ceases and its liability as a warehouseman begins is held not to be an act of executive administration, but one involving a legislative question, and as such can not be delegated to a railroad commission. *Jones Brothers v. Southern Railway Co.,* 76 S. C. 67.

A Tennessee legislature, without in express terms or by implication repealing the law requiring a jury trying a felony case to remain during the trial in the custody of the sheriff, undertook to provide that "in criminal trials, when the degree of punishment for the crime charged in the indictment is not above one year in the penitentiary, it shall not be necessary to place the jury in charge of an officer, but the jury may in the discretion of the court disperse as in other cases, and the state shall not be chargeable with their board". The court in *King v. State,* 87 Tenn. 304, in discussing the act said: "It undertakes to confer upon each judge of the criminal and circuit courts the power to suspend the general law, the judge's discretion being the only rule for his conduct. The statute before us permits the judge to have one rule in

one case and an opposite rule in another case in the same county and at the same term of court. Under it he may have a discretion to be exercised in one county, and the reverse of that discretion in another county. There is nothing in the act defining, controlling or limiting that discretion. He is not required to give or have a reason for its exercise the one way or the other, and therefore when he says the jury in this criminal case may disperse, and the jury in that criminal case shall go under the rule, the question is settled. Whether he is influenced in the one case by personal considerations for one or more of the jury, or in the other by motives of public policy, can make no difference. He is the sole judge of the question, and his reasons are his own, and there is no authority anywhere to inquire into them. * * * The general law remaining, it must be enforced in all cases unless the judge shall, by this statute, be permitted to say, I suspend it. When he makes the order on his minutes to that end he has performed a legislative and not a judicial act—an act the law has not commanded; an act that was not law until he saw proper to declare it so; an act that he may do and undo at will. He may disperse the jury today, and put the same jury under rule tomorrow. He is bound to no rule of action, and accountable to no one for his action. He is a legislative and judicial compound—something not recognized in our institutions''.

To prevent secrecy in operation and accounts and prevent the issuance and sale of fictitious or watered stock by public utility corporations created by a state, its legislature may in the exercise of its inherent power enact statutes providing generally for what purposes and upon what terms and conditions such agencies may be permitted to increase their capital stock, and confer upon a commission the power and duty to supervise the exercise of the privilege granted, ascertain the facts on which the application for an increase is based, and authorize the increase if the commission finds the facts that bring the case within the statute, otherwise to refuse it. ''Any statute, however, which attempts to authorize the commission in its judgment to allow an increase of capital stock for such purpose and on such terms as it may deem advisable,

or in its discretion to refuse it, would be unconstitutional as an attempt to delegate legislative functions", in the view of the Supreme Court of Minnesota, as held in *State* v. *Great Northern Railway Co.*, 100 Minn. 445.

In the *Northern Securities Company Cases,* 120 Fed. 721, 193 U. S. 351, both the Federal Circuit Court and the Supreme Court said, what has pertinency in this connection, that in a suit to enjoin the prosecution of a design formed by a combination to prevent competition between parallel and naturally competing railroad lines, the court "can not consider whether the combination may not be of greater benefit to the public than competition would be, that being a question of public policy to be determined by Congress." "Most unquestionably those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine what is necessary" for the accomplishment and enforcement of the object and purposes for which they are intended. "The policy of a statute is legislative, not judicial, and it is the exclusive province of the legislature to declare the scope and extent thereof by its prescription of measures of enforcement and otherwise". *George* v. *Board of Ballot Commissioners,* 90 S. E. (W. Va.) 550. The rule is universal, well recognized, imperative and everywhere understood that when exercised within its legitimate sphere the judgment of the legislature, as expressed in its enactments as to the expediency and necessity of the enforcement of any given law, is conclusive, and that the sole function of the judiciary is one of construction, interpretation, and application to the facts presented for adjudication, independent of any question of expediency, necessity, propriety or advisability as to its policy or enforcement. These questions the legislature only possesses the requisite authority to settle. It can not lawfully transfer to the judiciary the power to exercise a discretion to determine in the first instance whether a statute ought or ought not to be given an operative effect in any given case logically within its legitimate scope and intendment. The powers of courts do not extend to mere questions of expediency or necessity. They do not inaugurate or

establish the public policy of the state. That would be an infringement of article five of the constitution. The legislature alone possesses the authority to inaugurate or modify, and when it enacts a law courts can only legitimately decide whether by the enactment the limitations of the constitution have been infringed upon. *Prohibitory Amm. Cases,* 24 Kan. 700. A very apt illustration of these principles is found in several cases involving the same question, namely, whether it was the province of the legislature or the court to determine, under the constitutional provisions applicable, whether a particular act was "necessary for the immediate preservation of the public peace, health or safety", and hence not suspended in its operation until the expiration of the ninety day period otherwise allowed for submission to the people for approval on referendum. And it was decided in each case that it was the exclusive province of the legislature to determine the question of emergency, and its determination was conclusive upon the court. *State* v. *Bacon,* 14 S. D. 394; *Kadderly* v. *Portland,* 44 Or. 118; *Oklahoma City* v. *Shields,* 100 Pac. (Okl.) 560; *State* v. *Moore,* 145 S. W. (Ark.) 199. The same holding, with reference to the same emergency clause excepting laws from the referendum provision, was made in *Hanson* v. *Hodges,* 160 S. W. (Ark.) 392; *In re Senate Resolution No. 4,* 130 Pac. (Col.) 333.

The assumption is not permissible in any circumstances that the law makers intended an act sanctioned by them should conditionally be operative or effective, or suspended, if once in force. "That which purports to be a law of a state is a law or it is not a law according as the proof of the fact may be, and not according to the shifting circumstances of the parties. It would be an intolerable state of affairs if a document purporting to be an act of the legislature could thus be a law in one case and for one party and not a law in another case for another party; a law today and not a law tomorrow, a law in one place and not a law in another in the same state. And whether it be a law or not a law is a judicial question to be settled and determined by courts and judges". *Town of Ottawa* v. *Perkins,* 94 U. S. 260; *Wilkes County* v. *Coler,* 180 U. S. 506; *Rogers* v. *State,* 72 Ark. 565.

There is an additional reason for declaring the incompetency, ineffectuality and lack of adaptability of the act to accomplish the object or purpose sought to be controlled by it, a reason fully sustained by competent authority found in the decisions of courts of states wherein statutes containing similar provisions have been held to be invalid. By section 5, article 1 of the Constitution of the United States, relating to the membership of the Senate and House of Representatives, "each house shall be the judge of the election, returns and qualifications of its own members". The provisions of the act now being considered propose to intrude upon and supplement the exercise of the functions so conferred upon the upper branch of the Federal Congress; because section 16 provides that "in case of a judicial inquiry into corrupt and illegal practices connected with the election of a United States senator * * * the evidence and the opinion and determination of the court shall be certified to the governor, who shall transmit the same to the proper authorities of the United States government for such action as said authorities may deem proper".

In *Dinan* v. *Swig,* 112 N. E. (Mass.) 91, and *Smith* v. *District Court,* 50 Mont. 134, the supreme court of each state had before it an inquisition concerning the election of a member of the legislature conducted under the provisions of a corrupt practice act similar to but more definite than ours, and in each case it held the act unconstitutional, because inconsistent with and violative of the express grant to each branch of the state legislature to determine for itself, untrammeled by any enactment not authorized by the organic law, the election and qualification of its own members. Discussing the effect of the inquiry conducted under the supposed authority of the act of that state, the Massachusetts court said: "The proceeding created by the instant statute does not emanate from either branch of the legislature. It is set in motion by the initiative of five or more voters. It may result in sending to the legislative branch to which the defendant has been elected a decree setting forth the determination of the judges that a corrupt practice has been committed. That decree may be ignored by the branch of the

legislature to which it is sent. There is no legal compulsion resting upon that branch to take action respecting such decree. Only its sense of self respect and duty to the whole commonwealth to purge itself of a member unworthy of his office would impel it to pay heed to the decree. If action should be taken, it would still be open for that branch of the legislature to exercise its constitutional prerogative and to examine the whole issue for itself, and to decide whether the election and qualification of the member were such that he ought to be expelled and the election declared void. That decision, when made by the branch of the legislature concerned, would stand as final, and could not be disputed or reversed by any court or authority.  *  *  The constitution confers upon each branch of the legislature by necessary implication the power to determine for itself the procedure as to settlement of controversies touching the election and qualification of its own members and the ascertainment of all facts relative thereto, and to change the same at will.  *  *  The discretion to determine the method of procedure can not under the constitution be abrogated by an earlier legislature'', because ''it gives to each branch of each successive legislature an untrammeled power to proceed in its own manner and according to its own judgment, without seeking the concurrence or approval of the other branch or of the executive''. The Montana case states the same general doctrine and reaches the same conclusion. It says: ''At any time and at all times during the term of office each house is empowered to pass upon the present qualifications of its own members. The exercise of that power is necessary to preserve the entire independence of the two houses. Being a power exclusively vested in it, it can not be granted away or transferred to any other tribunal''. If the rationale of these cases is sound, when applied to the state whose legislature enacts the law condemned, the decisions show more clearly the futility of an act attempting to enforce its provisions upon a body wholly beyond its legitimate jurisdiction.

The views expressed herein, sustained as they are by competent authority, constrain us to award the writ sought by the petitioner.                                    *Writ issued.*