230 S.E.2d 629 (1976)
STATE ex rel. JOINT COMMITTEE ON GOVERNMENT AND FINANCE OF WEST VIRGINIA LEGISLATURE et al.
v.
Robert L. BONAR, Superintendent, West Virginia Department of Public Safety.
No. 13647.
Supreme Court of Appeals of West Virginia.
March 16, 1976.
Dissenting Opinion July 23, 1976.
George S. Sharp, Charleston, for appellant.
Earl M. Vickers, Legislative Services, Montgomery, George E. Carenbauer, Charleston, for appellees.
WILSON, Justice:
Appellant, Robert L. Bonar, Superintendent of the West Virginia Department of Public Safety, appeals from an order of the Circuit Court of Kanawha County, West Virginia, entered on August 6, 1975, awarding a writ of mandamus by which the appellant was compelled and commanded to provide the Joint Committee on Government and Finance of the West Virginia Legislature with certain records theretofore demanded in a subpoena issued by the Joint Committee and served on the appellant on April 21, 1975.
*630 Appellant contends that the records which are sought are privileged and confidential and that the information sought violates the rights of employees of the Department of Public Safety.
The Joint Committee on Government and Finance, created by statute, is empowered, among other things, to study and survey matters of government and finance; is granted access to records of every agency or department of the State; and is specifically granted the power to compel the attendance of witnesses and the production of books, papers, documents and records by the issuance of a subpoena. See W.Va. Code, Chapter 4, Article 3, Sections 1-4.
By House Concurrent Resolution No. 8, adopted May 24, 1974, the Legislature directed the Joint Committee on Government and Finance to make a comprehensive study of the administration and personnel policies of the Department of Public Safety so that recommendations might be made and legislation might be adopted to improve such administration and policies. By House Concurrent Resolution No. 45, adopted March 9, 1975, the Joint Committee on Government and Finance was directed to continue such studies.
Pursuant to such statutory and legislative authority and directions, a subcommittee of the Joint Committee issued and served a subpoena on Robert L. Bonar, Superintendent of the West Virginia Department of Public Safety, directing him to produce certain writings, documents or reports.[1]
The appellant refused to comply with the subpoena, and on June 10, 1975, the Joint Committee sought to enforce the subpoena by petitioning the Circuit Court of Kanawha County, West Virginia, for a writ of mandamus, the awarding of which prompts this appeal.
The Joint Committee and the appellant present the issues here involved as ones of great constitutional import suggesting a confrontation between the legislative and the executive branches of the government on the constitutional issue of separation of powers.
We do not see the issues in that dimension.
Not every dispute between a legislative body and a branch of the Executive Department rises to the level of a constitutional confrontation, and we are not required to view this case as a ". . . boundary dispute bottomed on irreconcilable claims to constitutional power." 12 U.C.L.A.L.Rev. 1044 (1964-1965).
However, to resolve the issues presented by this appeal with due regard for the real or imagined intrusions by one branch of government into the affairs of another, the common constitutional starting point is as follows:
"The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; . . ." W.Va.Const., Art. V, § 1.
Inherent in the constitutional concept of separation of powers is the acknowledgement that the powers granted and exercised by each department separately must in some way be conjoined to produce a governmental entity.
*631 Equally important is the acknowledgement that each separate department, in addition to its specific powers, has certain inherent powers without which its specific powers would be meaningless, and these inherent powers must also be conjoined to produce a governmental entity.
For example, the Legislature, in order to exercise its separate and distinct powers effectively, must have broad powers to acquire information regarding the subject matter of its legislation and to that end must necessarily acquaint itself with the manner in which various agencies of the government are being run. This Court has previously recognized this principle. Sullivan v. Hill, 73 W.Va. 49, 79 S.E. 670 (1913); and Cashman v. Sims, 130 W.Va. 430, 43 S.E.2d 805 (1947). It does not question that principle now. It recognizes that legislative investigatory powers are grounded in English, colonial and Congressional history.[2]
West Virginia history is free of instances in which the Executive Department of government has felt compelled to assert some sort of executive privilege against legislative investigatory intrusions. However, such confrontations, although infrequent, are a well-recognized part of the history of relationships between the Congress and the President of the United States.[3]
Other instances of constitutional confrontations have concerned clashes between individual rights and legislative powers; individual rights and executive privilege; legislative powers and judicial powers; and executive privilege and judicial process.
Many of these conflicts come to the courts in the context of the effect to be given to legislative or judicial subpoena powers.
When such conflicting claims must be judicially resolved, courts must endeavor to balance competing interests in such a manner as to do no violence either to the separate integrity of any branch of government or to the successful conjoinder of powers necessary to the formation of a governmental entity or to the individual rights of a free people.
This balancing of interests has produced some well-recognized and workable guidelines for those whose competing interests are, in the final analysis, defined and determined by the courts.
The judiciary has always guarded its own subpoena powers against any claim of executive privilege. See United States v. Burr, 25 Fed.Cas.No.14,692d, p. 30 (C.C.D.Va. 1807); and United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
Likewise, the courts go far to protect the rights of the Legislature in the pursuit of a legitimate legislative purpose by pertinent inquiries against any claim of privilege by individuals, other than the privilege against self-incrimination. See Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Wilkinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1960); and Braden v. United States, 365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961).
Similarly, the judiciary will not interfere with the legislative exercise of a subpoena power when such issuance is within a specific constitutional grant Eastland v. United States Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).
However, the courts will not assume that every legislative investigation is justified by a public need that overbalances private or executive rights or privileges. See Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); and Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929).
A less precise formula for the balancing of interests prevails in civil litigation. Cases can be found in which the courts have refused to require a department head to disclose information in civil actions. State v. Bouchelle, 122 W.Va. 498, 11 S.E.2d 119 *632 (1940); and Gardner v. Anderson, 9 Fed. Cas.No.5,220, p. 1158 (C.C.D.Md.1876). On the other hand, the courts will sometimes require production of documents, at least for in camera inspection. Smith v. Schlesinger, 168 U.S.App.D.C. 204, 513 F.2d 462 (1975); and Sun Oil Company v. United States, 514 F.2d 1020, 206 Ct.Cl. 742 (1975).
From the above authorities, with specific reference to the judicial or legislative subpoena power, it is apparent that the courts jealously guard their own subpoena powers and equally jealously guard the legislative subpoena power.
However, neither subpoena power is subject to unquestioned enforcement. The courts will, on proper motion, refuse to enforce a judicial subpoena duces tecum calling for the production of documents in the absence of a showing that the documents sought are relevant and material to the matter in controversy and that proof is not otherwise practically available. Ebbert v. Bouchelle, 123 W.Va. 265, 14 S.E.2d 614 (1941). A similar standard should prevail when the courts are asked to enforce a legislative subpoena duces tecum, and this would require the Legislature to show: (1) that a proper legislative purpose exists; (2) that the subpoenaed documents are relevant and material to the accomplishment of such purpose; and (3) that the information sought is not otherwise practically available.
The Joint Committee chose in this instance not to use legislative power to enforce obedience to its subpoena by attachment, fine or imprisonment. See W.Va. Code, Chapter 4, Article 1, Section 5; and Sullivan v. Hill, supra.
Instead, the Joint Committee chose to attempt to have the courts enforce its subpoena by mandamus. It might have sought the assistance of the courts under the W.Va.Code, Chapter 4, Article 3, Section 4, which provides as follows:
". . . If any witness subpoenaed to appear at such hearing shall refuse to appear or to answer inquiries there propounded, or shall fail or refuse to produce books, papers, documents or records within his or her control when the same are demanded, the committee shall report the facts to the circuit court of Kanawha county or any other court of competent jurisdiction and such court may compel obedience to the subpoena as though such subpoena had been issued by such court in the first instance. . . ."
Under the provisions of Article 5, Section 1 of the Constitution of West Virginia, this must be considered a grant of judicial authority, because the courts of this State are forbidden to exercise legislative authority of any kind. See County Court v. Demus, 148 W.Va. 398, 401, 135 S.E.2d 352 (1964); and Sutherland v. Miller, 79 W.Va. 796, 91 S.E. 993 (1917).
Consequently, in considering the enforcement of a legislative subpoena duces tecum, the courts will apply principles long used by them in determining whether to enforce a judicial subpoena duces tecum.
In the instant case, the broad legislative purpose as proclaimed by the Legislature is not open to question and should not generally be resisted by any claim of executive or other privilege by the Superintendent of the Department of Public Safety. However, the relevancy and materiality of the documents requested, namely the originals of certain Activity Reports and Rating Sheets, have not been established. The Joint Committee made no effort, in its petition filed below, to set forth facts showing such necessity. It did not otherwise endeavor to make such a showing. Likewise, not only did it fail to establish that the information sought was not otherwise practically available, but indeed it appears from the face of the record that much of the requested material had previously been supplied in the form of copies. Some parts of the Joint Committee's subpoena here in issue seem more dictated by local rather than legislative interests. Further, some of the Joint Committee's arguments sound more in prosecutorial than in legislative concerns.
Perhaps the most pertinent case having a bearing on the issues involved in the instant case is Senate Select Committee v. Nixon, 162 U.S.App.D.C. 183, 498 F.2d 725 (1974).
*633 The court held that it would not enforce a Congressional subpoena duces tecum served on the President of the United States for the production of tape recordings of conversations between the President and a presidential aide. The rationale of the court's decision was that the court could find no merit in the argument that the Committee needed to resolve conflicting testimony and that such resolution was critical to the Committee's performance of its legislative function. The court frankly acknowledged that fact-finding by a legislative committee was undeniably a part of its task. However, it pointed out that Congress frequently legislated on the basis of conflicting information provided in its hearings. The court further rejected any comparison between the proceedings of a legislative committee and the proceedings of a grand jury. It pointed out that the proper discharge of the responsibility of a grand jury would turn entirely on its ability to determine whether there was probable cause to believe that certain named individuals committed certain specific crimes. Such judicial need for a showing of probable cause, the court contended, was much different from the legislative need for information which might very well be expected to be conflicting without interfering with the proper legislative purpose of legislating.
In the absence of a showing by the Joint Committee of the relevancy and materiality of the specific documents to a proper legislative as opposed to some other purpose, and in the absence of a showing that the information sought was not otherwise practically available, the court below should have denied access to such material, particularly when the Superintendent of the West Virginia Department of Public Safety raised such questions based on the protection of whatever rights employees of the Department might have against unnecessary disclosure of personal and confidential information concerning them.
For the reasons above stated, the order of the Circuit Court of Kanawha County, West Virginia, issuing a writ of mandamus compelling the production of the originals of certain specified documents from the Superintendent of the West Virginia Department of Public Safety, is reversed, and the case is remanded to that court with directions to dismiss the proceeding.
Reversed and remanded.
NEELY, Justice (dissenting):
I respectfully dissent from the majority opinion. Under the Constitution and the laws of this State, the West Virginia Legislature is absolutely entitled to subpoena every scrap of paper from every official file of every officer, agent, employee, and servant of the State of West Virginia. Although the majority opinion does not appear to question this proposition, insofar as the Legislature may enforce obedience to its subpoena by attachment, fine or imprisonment, it is illogical that the less disrupting remedy of mandamus is not also available.[1]
The right of the West Virginia Legislature to inquire into all the operations of the executive branch is supported not only by a constitutional tradition based upon nine centuries of Anglo-American precedent but also by our statutory law, W.Va.Code, 4-1-5 [1923]; W.Va.Code, 4-3-4 [1965].[2] When statutes are plain and unambiguous *634 they should be applied and not construed. Crockett v. Andrews, 153 W.Va. 714, 172 S.E.2d 384 (1970). Consequently there is a clear legal right; the contempt power is not made an exclusive remedy and mandamus will lie.
The facts of this case indicate that the Joint Committee on Government and Finance was empowered by the Legislature to conduct a study of the administrative and personnel policies of the Department of Public Safety, with particular regard to its policies on discipline, promotion, transfer, suspension, and termination of members. Two transfers were brought to the attention of a subcommittee duly authorized by the appellee Joint Committee to hold hearings to determine whether the current discretion given to the Superintendent of the Department of Public Safety to make transfers should be modified by new legislation.
During the course of its investigation the subcommittee held a hearing on February 3, 1975, to inquire into the circumstances of Corporal Gordon L. Swartz' transfer from the Clarksburg detachment of the Department to the West Union detachment. One of the witnesses at this hearing, Lieutenant Colonel H. C. Beverly, second in command to the Superintendent, told the subcommittee that he would provide them with the rating sheets covering the period during which Corporal Swartz was stationed in Clarksburg.
Another transfer of particular concern to the subcommittee was the reassignment of Sergeant Edward L. Armstrong from Elkins to Webster Springs. A hearing was scheduled for February 17, 1975 to ascertain the reason for this transfer. Before the hearing the Subcommittee met with Captain C. M. White, the Commander of Company C who ordered Armstrong's transfer. At this meeting Captain White stated that the transfer was due in part to Sergeant Armstrong's performance relative to the other sergeants in Company C, citing as an example the small number of arrests which Armstrong had made, as noted on his 1974 activity report. Responding to this disclosure, the subcommittee issued a subpoena to *635 Captain White directing him to bring before the subcommittee copies of the activity reports and rating sheets of Sergeant Armstrong and the other sergeants in the company. At the February 17th hearing Captain White was sworn and presented to the subcommittee apparent copies of the activity reports and rating sheets subpoenaed. In response to questions by members of the subcommittee, he testified that he had prepared the rating sheets and sent the originals to Charleston some time before Armstrong's transfer. He testified that First Sergeant W. H. Huff had reviewed the rating of Sergeant Armstrong, and that the witness had not discussed with Sergeant Armstrong any of the deficiencies noted on his rating sheet in spite of department policy which required him to consult his subordinates about such matters.
The subcommittee became concerned about irregularities surrounding preparation and production of the documents presented by Captain White after it received further testimony from First Sergeant Huff. In response to questions from the subcommittee, First Sergeant Huff stated that he had not seen the rating sheets for Sergeant Armstrong and the other sergeants until the day of the subcommittee's hearing when he was asked by Captain White to review them. Huff testified that he had never seen the original copies prepared and sent to Charleston, but rather only the duplicate copies presented to the subcommittee. When asked if he concurred in the rating of Armstrong, he replied that as a practical matter he would not make changes in ratings made by a superior officer, such as Captain White.
The subcommittee found inconsistencies in the testimony of various members of the Department which raised questions about the veracity of the records presented at the hearing concerning Sergeant Armstrong, and accordingly the subcommittee directed its staff to request from the Superintendent the originals of all documents which Captain White stated he had sent to Department Headquarters before Sergeant Armstrong's transfer. At the same time a request was made for Corporal Swartz' records which Lieutenant Colonel Beverly had promised but not provided. While this controversy might at first appear petty, it is not; in fact, the legislative inquiry which is the subject of this appeal goes to the question of possible perjury by employees of the executive branch before a legislative subcommittee.
Giving or conspiring to give false testimony are, of course, serious offenses for which one may be subject to criminal prosecution. Initiating such prosecution is not, however, the Legislature's sole means of vindicating the integrity of its fact-finding process. The West Virginia Constitution vests power in the Legislature to impeach any officer of the State for "maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor." W.Va. Constitution, Art. 4, § 9. Within the broad scope of the provision there surely exists a mandate for the impeachment of officials who are implicated in presenting false testimony or documents to a properly constituted legislative subcommittee engaged in its constitutional business.[3] Therefore, I conclude that there is constitutional as well as statutory support *636 for the Joint Committee's subpoena, inasmuch as the materials sought to be produced might have a bearing on impeachable offenses, possibly committed by officers of the State of West Virginia.[4]
The judiciary is not the repository of all knowledge and wisdom in government despite pervasive notions to the contrary among courts and members of the bar. The West Virginia Legislature may not be perfect; however, it is the only legislature that we have to protect the rights, privileges, and immunities of the citizens of this State from an over-zealous, non-responsive, and potentially tyrannical executive branch.
A reasonable inference may be drawn from the facts presented to this Court that public support for certain members of the Department of Public Safety who were popular in the areas from which they were transferred caused certain legislators to take up the cause of these members in the context of an investigation of the Department of Public Safety. However, the motives of the Legislature are irrelevant, so long as its activities are conducted pursuant to a legislative purpose.
Increasingly the most important governmental decisions are made by officials of the executive branch who are neither democratically elected nor popularly responsive. While theoretically the Governor, who is the appointing authority, is both democratically elected and popularly responsive, the degree of actual democratic control of any part of the executive branch is speculative at best.
Under our scheme of government each branch is checked and balanced by the other two, yet the clear direction of this Court in deciding constitutional questions between the legislative branch and executive branch is increasingly to place all the power on the side of the executive. State ex rel. Brotherton v. Blankenship, W.Va., 207 S.E.2d 421 (1973) (Neely, J. dissenting at 436); State ex rel. Brotherton v. Blankenship, W.Va., 214 S.E.2d 467 (1975) (Neely, J. dissenting at 492).
The history of liberty is the history of legislatures. Legislatures are not an abstract outgrowth of classical Greek or Roman political philosophy, but rather a valuable inheritance from medieval England. *637 cf. 1 and 2 G. Trevelyan, History of England; 1 T. Macaulay, History of England, chapter 1. The spirit of medieval law was highly respectful of established rights in property, status, and privileges throughout society from the king to the lowliest unfree men. 1 F. Pollock & F. Maitland, History of English Law, book 2, chapters 1 and 2.
From the days in which Simon de Montfort challenged Henry III in the Baron's War, there has been a constant struggle between the centralized power of the executive branch (which today includes such appointed figures as the Superintendent of Public Safety) and the people through their parliaments or legislatures. The people have always, rightly or wrongly, struggled against interference by the executive with the traditional way in which they have ordered their lives as evidenced as early as 1236 in the Merton Parliament at which the Barons declared with one voice "nolumus leges Angliae mutare."
No one has ever accused a legislature of being efficient; however, efficiency is not the ultimate end of government. The lack of efficiency is frequently a conscious effort on the part of individuals to humanize society. On the other hand, efficient government, which is often best accomplished through the use of colorless, odorless, tasteless, non-political, non-responsive, bureaucratic appointees is not necessarily good government. The governance of a prison operates with methodical efficiency. However, unchecked power in the guise of efficiency encourages tyranny. I would agree with Mary McCarthy that "bureaucracy, the rule of no one, has become the modern form of despotism." The New Yorker, October 18, 1958.
The State of West Virginia is not the Federal Government;[5] precedent applicable to the President of the United States, who is responsible for the national defense, is not applicable to the Governor of West Virginia or his appointees. There is no colorable state interest in secrecy when the national security is not involved. While there are alien enemies who could profit militarily from the disclosure of certain information guarded by the national government, the State of West Virginia has no alien enemies, only its own citizens. While irate and concerned citizens may appear hostile and seditious to those holding authority, such citizens are the mainstay of a freewheeling and critical democratic process which is the only protection against both governmental excess and indifference.
It is impossible to find a consistent thread of precedent through Anglo-American jurisprudence with regard to the proper boundaries of the executive and legislative powers. On the question of the Legislature's power to subpoena information from the executive branch there are as many opinions as there are executives, legislators, and judges. For a collection of the authorities see R. Berger Impeachment: The Constitutional Problems, (Harvard University Press 1973); R. Berger, "Executive Privilege v. Congressional Inquiry," 12 U.C.L.A.L.Rev. 1044; A. Cox, "Executive Privilege," 122 University of Pennsylvania L.Rev. 1383; R. Kramer and H. Marcuse, "Executive Privilege  A Study of the Period 1953-1960," 29 Geo. Washington L.Rev. 623.
My own conclusion from the precedents of both law and history is that the legislative branch should be strengthened rather than weakened. I perceive the majority opinion as but one more step in the removal of the control of government from democratically elected and popularly responsive political officials whose contact with the citizenry is real and not theoretical in favor of placing the control of government in the hands of a distant bureaucracy whose responsiveness to the citizenry is exclusively theoretical.
NOTES
[1] The writings, documents or reports which were sought by said subpoena are as follows: ". . . (1) The originals, as received in the Central Headquarters Office of the Department of Public Safety, of the Activity Reports covering the period January through December 1974 for the sergeants stationed in Company C during that time, namely Sergeants E. M. Armstrong, J. L. Martin, Richard Osburn, J. H. Parsons and Russell Pitzer; (2) The originals, as received in the Central Headquarters Office of the Department of Public Safety, of the Rating Sheets for 1974 for each of the above named sergeants; (3) The originals, as received in the Central Headquarters Office of the Department of Public Safety, of all of the Activity Reports and Rating Sheets for Sergeant E. M. Armstrong since his being stationed at the Elkins detachment of the Department of Public Safety in 1969; (4) The originals, as received in the Central Headquarters Office of the Department of Public Safety, of all the Rating Sheets for Corporal Gordon L. Swartz since his being stationed at the Clarksburg detachment of the Department of Public Safety in 1972. . . ."
[2] For a provocative discussion of the origins and development of the rights of inquiry by legislative bodies, see 12 U.C.L.A.L.Rev. 1044, 1056-1066 (1964-1965).
[3] For a summary, see Nixon v. Sirica, 159 U.S. App.D.C. 58, 487 F.2d 700, 732-734 (1973).
[1] In my view the mandamus remedy is a particularly appropriate means of enforcing legislative subpoenas, since it produces only a minimum level of confrontation between coordinate branches of government. As a result of the majority's holding in this case, the Legislature may now resort more frequently to its statutory powers under W.Va.Code, 4-1-5 [1923] for the enforcement of its subpoenas, thereby increasing the level of tension and confrontation between the Legislature and the Executive.
[2] W.Va.Code, § 4-1-5 provides:

"When the senate or house of delegates, or a committee of either house, authorized to examine witnesses, or to send for persons and papers, shall order the attendance of any witness, or the production of any paper as evidence, a summons shall be issued accordingly, signed by the presiding officer or clerk of such house, or the chairman of such committee, directed to the sheriff or other proper officer of any county, or to the sergeant-at-arms of such house, or any person deputed by him. And when served, obedience thereto may be enforced by attachment, fine or imprisonment at the discretion of the house which appointed the committee; and if the committee be authorized to sit during the recess of the legislature or the recess of the house which appointed the committee, then obedience to the summons may be enforced by such committee as aforesaid. And when a committee is appointed by each house under any joint or concurrent resolution, and directed to sit jointly, with authority to examine witnesses or send for persons and papers, the summons aforesaid may be signed by the chairman of the committee on the part of the senate or the chairman of the committee on the part of the house of delegates; and obedience thereto may be enforced as aforesaid by the house which appointed the committee which directed the summons to be issued; and if such committees be authorized to sit during the recess of the legislature, then obedience to the summons aforesaid may be enforced as aforesaid by the committee which directed the summons to be issued."
W.Va.Code, § 4-3-4 provides:
"For the purpose of obtaining information in conjunction with the formulation of new laws or the revision of existing laws, the committee, or an employee duly authorized by the committee, shall have access to records of every agency or department of the State.
"In addition, the committee, or any employee duly authorized by the committee, is empowered to hold public hearings at such times and places within the State as may be desirable to make investigations and surveys, and either cochairman or any member of the committee shall have the power to administer oaths to persons testifying at such hearings. By subpoena, issued over the signature of either chairman of the committee and served in the manner provided by law, the committee may summon and compel the attendance of witnesses and their examination under oath and the production of all books, papers, documents and records necessary or convenient to be examined and used by the committee in the performance of its duties. If any witness subpoenaed to appear at such hearing shall refuse to appear or to answer inquiries there propounded, or shall fail or refuse to produce books, papers, documents or records within his or her control when the same are demanded, the committee shall report the facts to the circuit court of Kanawha county or any other court of competent jurisdiction and such court may compel obedience to the subpoena as though such subpoena had been issued by such court in the first instance. Witnesses subpoenaed to attend such hearings shall be allowed the same mileage and per diem as is allowed witnesses before any petit jury in this State."
[3] While there has been much debate recently within the national government as to the meaning and content of "high crimes and misdemeanors," few would contend that the phrase does not include violations of existing criminal law. Furthermore, the West Virginia Constitution provides other bases for impeachment which give the West Virginia Legislature greater latitude than the United States Congress in controlling officials in the other branches of government. Compare W.Va.Const., art. 4, § 9 with U.S.Const., art. 2, § 4. "Maladministration," as found in the West Virginia impeachment provision, was, for example, proposed for inclusion in the corresponding United States Constitutional provision but rejected on grounds that "so vague a term will be equivalent to a tenure during the pleasure of the Senate." 2 M. Farrand, The Records of the Federal Convention of 1787, 550 (New Haven, Conn., 1911). Although a popular view of impeachment might only contemplate the removal of a chief executive, in fact the impeachment power has traditionally been used as much to remove corrupt officials serving under the chief executive. Such action might well be pursued under the rubric of "maladministration."
[4] A careful reading of the history of the impeachment power in Anglo-American legal tradition lends considerable support to the proposition set forth in the text. The history demonstrates that impeachment was for the English "the chief institution for the preservation of government." Said by the House of Commons in 1679, quoted 1 Sir W. S. Holdsworth, A History of English Law 383 (London, 3d ed. 1922). And with the English experience fresh in mind the framers of the United States Constitution were doubtless well aware of the high political purposes served by impeachment. See B. Bailyn, Ideological Origins of the American Revolution (Cambridge, Mass., 1967).

Impeachment originated in England in the late fourteenth century and, except for a 162 year lapse between 1459 and 1621, continued to be a potent weapon for Parliament in its struggle to gain supremacy over the Crown. Direct attacks upon the King were unthinkable, so Parliament exerted its control indirectly, by bringing to heel the King's ministers. As Blackstone commented, "For as a king cannot misuse his power, without the advice of evil counsellors, and the assistance of wicked ministers, these men may be examined and punished." 1 Sir William Blackstone, Commentaries on the Laws of England 244 (Oxford, 1765-1769). The following examples are illustrative of Parliament's exercise of the impeachment power and the development of ministerial accountability. Chancellor Michael de la Pole, Earl of Suffolk was charged in 1386 with misappropriation of funds, and Sir Edward Seymour was likewise charged in 1680. The Duke of Buckingham in 1626 and Peter Pett, Commissioner of the Navy in 1668 were both charged with neglect of duty. For abuse of official power many were charged, including the Duke of Suffolk in 1450, the Duke of Buckingham in 1626, Justice Berkley in 1637, Attorney General Yelverton in 1621, Viscount Mordaunt in 1660, and Chief Justice Scroggs in 1680. Sir Richard Gurney, lord mayor of London (1642) and Chief Justice North (1680) were called to account for their encroachment on Parliament's prerogatives. And finally, and perhaps of most interest, charges were brought against some of the King's ministers for giving pernicious advice to the Crown. Included within this last category, were the Earl of Orford (1701), Lord Somers (1701), Lord Halifax (1701), Viscount Bolingbroke (1715), the Earl of Strafford (1715), and the Earl of Oxford (1717).
[5] I would note one significant difference which bears directly upon the allocation to the Legislators of the power here in issue. In the Federal Government Congress receives its power only by express grant or by necessary implication from an express grant. In contrast the West Virginia Legislature's power is almost plenary, subject only to express or necessarily implied constitutional restrictions. State ex rel. County Court v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964); Robertson v. Hatcher, 148 W.Va. 239, 135 S.E.2d 675 (1964).